OPINION OF THE COURT
Ruth Jane Zuckerman, J.
This neglect proceeding was brought by the Commissioner of Social Services pursuant to article 10 of the Family Court Act.[1] The petition, as amended, in substance alleged that "Male” R., born to respondent on November 26, 1978, was a "neglected child” within the meaning of section 1012 (subd [f], par [i]) of the Family Court Act in that (1) at birth he was suffering from "mild drug withdrawal symptoms”; (2) respondent is "addicted to cocaine, barbiturates and alcohol [and] * * * has refused to enroll in either an alcohol or a drug program”; and (3) as a result of her "drug abuse”, respondent is unable to properly care for her child.
Since birth, "Male” R. has been either in the hospital or, pursuant to the remand orders of the Family Court, in the custody of the Commissioner of Social Services.[2]
*3 A fact-finding hearing was held on June 13, 1979, at which a BCW caseworker, Willie Peoples, and the respondent Billie R. testified. The hospital records of respondent and of the child who is the subject of this proceeding were admitted in evidence without objection. At the conclusion of the hearing, the court reserved decision, and requested briefs from all parties.
The competent, relevant and material evidence[3] in this case may be summarized as follows:
When respondent was admitted to Cumberland Hospital’s obstetrical service on November 25, 1978, respondent stated that during her pregnancy, she used the following medications: cocaine (sporadically since March, 1978), barbiturates (Tuinal) and alcohol.[4] The child, "Male” R., was born prematurely and with mild drug withdrawal symptoms on November 26, 1978; he remained in the hospital for observation and treatment for several weeks after his birth.[5]
Because the infant was born suffering from drug withdrawal symptoms, a report of suspected child abuse or maltreatment was filed by Cumberland Hospital.[6] This report, in turn, was received by Willie Peoples, a BCW caseworker, who interviewed respondent. Ms. Peoples, an experienced social worker, testified that her first meeting with respondent took place on December 28, 1978 and that at that time she observed respondent as being "high”. Ms. Peoples also testified that respondent admitted to her that she was addicted to barbiturates at the time of her pregnancy as well as after the birth of "Male” R. and that respondent said she did not know how many pills she took each day.[7] According to Ms. Peoples’ testimony, when respondent was asked about participating in a drug program, respondent insisted that no program existed for her particular addiction, and that she could detoxify herself. However, Ms. Peoples testified that drug programs do exist for respondent’s barbiturate problem; that she had referred respondent to a *4 suitable drug program, but that respondent had resisted suggestions that she enroll in such program; that at various times between January, 1979 and May, 1979, respondent had been enrolled in, but had only intermittently attended, a suitable drug program; and that respondent was not in a drug program at the time of the hearing, although she still was in need of such program for her continuing barbiturate problem. Finally, Ms. Peoples testified that when under the influence of barbiturates, respondent would be unaware of, and incapable of responding to, the infant’s most basic needs, and that her excessive use of barbiturates thus created a danger that the child’s physical condition would be impaired if he were in her custody.
Respondent’s medical records as well as her testimony at the hearing furnished additional evidence of her excessive barbiturate use. As to the former, in addition to the medical history given by respondent on her admission to Cumberland Hospital’s obstetrical service in November, 1978, respondent’s medical records include a report of respondent’s examination at Cumberland on June 13, 1978. At that time, respondent complained of not being able to "get off” barbiturates and admitted using Tuinal, a barbiturate, at a dosage of three grains, three times daily. As to the latter, although respondent’s testimony at the hearing was, at times, quite confused and incoherent,[8] respondent admitted that she had told a physician at Cumberland Hospital that she had taken barbiturates throughout her pregnancy. She also testified that although, at the time of the hearing, she was not in any drug program, she planned to enroll in one "tomorrow.” Respondent’s testimony that she planned to enroll in a drug program the day after the hearing, under the circumstances, is tantamount to an admission by her in open court that her drug problem still existed at the time of the hearing. Finally, although respondent testified in very general terms about infant care and stated that she could care for her child, her testimony in no way undercut the evidence presented by the petitioner with respect to the imminent danger to the infant which respondent’s excessive use of barbiturates would create.
*5 Petitioner having established by a preponderance of the competent, relevant and material evidence[9] the allegations that (i) at birth the infant was suffering from mild withdrawal symptoms; (ii) the respondent is an abuser of barbiturates and has refused to enroll and remain in a drug program; and (iii) as a result of her abuse of barbiturates, respondent is unable to care for the child,[10] the only question that remains is whether the allegations which have been proven are legally sufficient in the circumstances of this case to support the conclusion that the infant is a neglected child within the meaning of article 10 of the Family Court Act.
Subdivision (f) of section 1012 of the Family Court Act, in pertinent part, states:
" 'Neglected child’ means a child less than eighteen years of age
"(i) whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care * * *
"(B) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment; or by using a drug or drugs; or by using alcoholic beverages to the extent that he loses self-control of his actions; or by any other acts of a similarly serious nature requiring the aid of the court”.* [11]
Under the terms of subdivision (f) of section 1012, a finding of neglect can be based upon either the actual impairment of a child’s physical condition or the imminent danger of such impairment. In the instant case, petitioner contends that the facts established at the hearing support a finding of neglect on both bases. To establish imminent danger of impairment, petitioner relies upon the effect, after the infant’s birth, that *6 respondent’s continued excessive use of barbiturates would have upon her ability to provide him with adequate care and supervision. To show actual impairment, petitioner relies upon the drug withdrawal symptoms from which the infant suffered at and for some time after delivery.
With respect to imminent danger of impairment, when subdivision (f) of section 1012 is read along with section 1046 (subd [a], par [iii]) of the Family Court Act, it is clear that the evidence in this case is sufficient to support a finding of neglect. Section 1046 (subd [a], par [iii]) provides that in any article 10 hearing, "proof that a person repeatedly uses a drug, to the extent that it has or would ordinarily have the effect of producing in the user thereof a substantial state of stupor, unconsciousness, intoxication, hallucination, disorientation, or incompetence, or a substantial impairment of judgment, or a substantial manifestation of irrationality, shall be prima facie evidence that a child of or who is the legal responsibility of such person is a neglected child”.
The testimony of respondent as well as that of Ms. Peoples established respondent’s regular and excessive use of the barbiturate Tuinal both before and after the infant’s birth.[12] As to whether respondent’s excessive use of barbiturates would ordinarily have any of the effects described in section 1046 (subd [a], par [iii]), Ms. Peoples also testified, without contradiction, that she had observed respondent to be "high”, and that respondent’s barbiturate use created a danger to the child for the reason that when under the influence of the drug, respondent’s judgment and her ability to think clearly would be impaired. Moreover, it is common knowledge that barbiturates, by their very nature are sleep-inducing drugs; thus, it is clear that their excessive use, which respondent admitted, would ordinarily induce a state of "stupor or unconsciousness” as well as the "substantial impairment of judgment” to which Ms. Peoples testified. Therefore, under subdivision (a) of section 1046, petitioner has established a prima facie case, which respondent has failed to rebut, that the infant is a neglected child within the meaning of subdivision *7 (f) of section 1012 of the Family Court Act. Because, however, respondent has never had actual physical custody of her child since his birth, a question has been raised as to whether a finding of neglect can be made based upon imminent danger to the child "as a result of the failure of his parent * * * to exercise a minimum degree of care * * * in providing * * * proper supervision or guardianship * * * by using a drug or drugs”.[13] Put another way, must the evidence establish that the respondent actually failed to provide the child with proper supervision while he was in her custody?
Although subdivision (f) of section 1012, if viewed in isolation, arguably could be read to require that the child actually had been under the respondent’s care and supervision prior to the filing of a neglect petition, such reading becomes untenable when subdivision (f) of section 1012 and section 1046 of the Family Court Act are read together. Under section 1046 (subd [a], par [iii]), a prima facie case that a child is neglected is made where a parent has used drugs to the extent set forth in that provision. There is no requirement under section 1046 (subd [a], par [iii]) of proof that respondent in a given case actually was affected by the drug or drugs in the manner stated; proof of the ordinary effects, in light of the use in question, is sufficient.
If, as is clear under section 1046 (subd [a], par [iii]), a prima facie case of neglect can be made, where a child is actually in a parent’s custody, without proof of specific circumstances, it makes little sense to insist on the formality of actual custody simply because of section 1012’s language regarding supervision. Actual physical custody thus adds nothing since even where a respondent had custody the actual conduct of the respondent — apart from the extensiveness of drug use — need not be shown. In either case, the evidentiary rule of section 1046 (subd [a], par [iii]) operates to eliminate a requirement of specific parental conduct vis-á-vis the child; thus neither actual impairment nor actual risk of impairment need be established in cases in which section 1046 (subd [a], par [iii]) of the Family Court Act applies.
Although there is no case law addressing the precise question raised, cases which have applied section 1046 (subd [a], par [i]) of the Family Court Act provide support by analogy for the conclusion that actual custody of the child is not required *8 when a prima facie case of neglect is established under section 1046 (subd [a], par [iii]). Section 1046 (subd [a], par [i]) states that in any child protective hearing held under article 10 "proof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child of, or the legal responsibility of, the respondent”.[14] In a number of cases, a newborn infant, who was never in the actual custody of his parents, was held to be neglected on the bases of a showing, under section 1046 (subd [1], par [i]), that siblings of the newborn had previously been adjudicated abused or neglected. (See, e.g., Matter of Katherine J., 71 Misc 2d 47; Matter of Fred S., 66 Misc 2d 683.)[15] No showing of actual impairment or of actual risk of impairment of the newborn was required in these cases.
Since the evidentiary rule of section 1046 (subd [a], par [iii]) of the Family Court Act, like that of section 1046 (subd [a], par [i]), does not, by its terms, require that actual risk of impairment be established by proof of conduct which occurred while the child was in a respondent’s custody, the language of subdivision (f) of section 1012 does not constitute a barrier to an adjudication of neglect in this case. The evidence adduced having triggered the operation of section 1046 (subd [a], par [iii]), it is sufficient that there would be a substantial risk of impairment if, under the circumstances of this case, the child had been in the respondent’s care. Petitioner thus has established by a preponderance of the competent, relevant and material evidence that respondent’s child is a neglected child within the meaning of article 10 of the Family Court Act.
As was noted above, petitioner also contends that the actual *9 impairment at birth of the infant’s condition provides a second, independent basis for a finding of neglect in this case. Although it is clear that as a result of respondent’s conduct, the infant’s physical condition at and for some time after delivery was actually impaired, it is far from clear that such impairment, caused as it was by prenatal maternal conduct, would be sufficient, standing alone, to support a finding of neglect. Not surprisingly, there is little case law on the subject, and such authority as exists is inconclusive. At least one court, in dicta, stated that "a new-born baby having withdrawal symptoms is prima facie a neglected baby under article 10 of the Family Court Act”. (Matter of Vanessa "F”, 76 Misc 2d 617, 619.) It is not clear, however, whether the court in Vanessa "F” was referring to withdrawal symptoms as providing an evidentiary basis for a finding of postnatal maternal drug use or addiction, which finding, in turn, could establish, under subdivision (f) of section 1012 and section 1046 (subd [a], par [iii]) of the Family Court Act, a prima facie case that the child was in imminent danger of physical harm and was, therefore, neglected,[16] or whether the court was referring to withdrawal symptoms as providing an evidentiary basis for a finding that the child had actually suffered physical impairment — albeit by reason of prenatal maternal conduct— and was, therefore, at birth, a neglected child under subdivision (f) of section 1012 of the Family Court Act.[17]
It is a difficult question whether an adjudication of neglect can be based, at least in some cases, solely upon prenatal maternal conduct which has caused the actual impairment at *10 birth of a child’s physical condition.[18] However, a finding of neglect having been made by the court against respondent on the basis of the evidence of imminent danger of impairment of the child’s physical condition, it is unnecessary in the case at bar to resolve the many novel issues that are raised by petitioner’s alternative theory.
A finding of neglect having been made against respondent pursuant to subdivision (a) of section 1051 of the Family Court Act, this matter is set down for a dispositional hearing on December 21, 1979, at 9:30 a.m., Part 7. The Department of Probation is directed to prepare an investigation and report. In addition, a Bureau of Mental Health Services study of respondent is ordered.
On the basis of the evidence adduced at the fact-finding hearing, the court finds that continued removal of the child from respondent’s home is necessary to avoid an imminent risk to his life and health and that there is a substantial probability that the final order of disposition will be an order of placement under section 1055 of the Family Court Act. Accordingly, pursuant to section 1051 of the Family Court Act, remand of the infant to the Commissioner of Social Services is continued pending entry of a final order of disposition.

. The respondent received adequate notice of the proceedings and has been represented by court-appointed counsel. In addition, the child, "Male” R., has been represented by a court-appointed Law Guardian.

. At the commencement of this proceeding in January, 1979, the child was remanded to the care of the Commissioner of Social Services. On January 18, 1979,' respondent’s attorney requested a hearing pursuant to section 1028 of the Family Court Act. Although a section 1028 hearing was scheduled for January 22, 1979, respondent failed to appear. A stayed warrant was issued for respondent, and the case was adjourned to February 23, 1979. On February 23, 1979, respondent appeared, but apparently neither on tho date nor at any subsequent time was the request for a section 1028 hearing rene jd. Between February 23,1979 and June 13, 1979, the case was twice adjourned and the remand of the child continued on consent of all parties.

. Family Ct Act, § 1046, subd (b), par (ii).

. This information is contained in the medical history given by respondent on her admission to the hospital on November 25, 1978.

. The child’s condition at birth, and for some time thereafter, was fully documented in the Cumberland Hospital record.

. The report (form DSS 2221-A), dated November 29, 1978, was admitted in evidence pursuant to sections 413 and 415 of the Social Services Law.

. In her conversation with Ms. Peoples as well as in her testimony at the hearing, respondent denied using alcohol or cocaine.

. In response to a question posed by her attorney on direct examination, respondent stated that she had not been in any drug program prior to the hearing but that she had been to a mental health clinic for her problem. On cross-examination, however, she stated that she was not presently in a drug program, that there was none for her problem, that she had been in one until two or three weeks before the hearing and that she planned to enroll in one "tomorrow.”

. Family Ct Act, § 1046, subd (b), pars (i), (ii).

. No evidence was offered at the hearing to establish respondent’s addiction to or use of cocaine and/or alcohol after the child’s birth.

. A drug, for purposes of article 10 of the Family Court Act is "any substance defined as a controlled substance in section thirty-three hundred six of the public health law”. (Family Ct Act, § 1012, subd [d].) Tuinal contains amobarbital soduim and secobarbital sodium and is a barbiturate (see Physician’s Desk Reference [31st ed], p 1000); it is a controlled substance under section 3306 (schedule III, subd [a], par [1]) of the Public Health Law.

. The hospital records established respondent’s excessive use of Tuinal throughout her pregnancy. In addition, the fact that the infant was born with mild withdrawal symptoms is evidence of respondent’s drug use at least during the latter part of her pregnancy, as well as evidence from which it is not unreasonable to infer continued use of drugs after the infant’s birth. However, such inference as to continued use is not necessary to the decision in this case since other evidence clearly established that respondent’s excessive use of barbiturates continued up to the time of the hearing.

. Family Ct Act, § 1012, subd (f); emphasis supplied.

. Unlike section 1046 (subd [a], par [iii]) of the Family Court Act, section 1046 (subd [a], par [i]) does not expressly address the question of what constitutes a prima facie case. However, section 1046 (subd [a], par [i]) has been held to establish a rebuttable presumption of abuse or neglect. (Matter of Kenya G., 74 Misc 2d 606.) Thus, in Kenya G., even where a newborn infant had actually lived with respondent for a number of months without any evidence of abuse or neglect, the court held — on the basis of evidence of respondent’s prior abusive conduct toward the newborn’s sibling — that a prima facie case had been made out with respect to the newborn infant.

. See, also, Matter of Santos, 71 Misc 2d 789 (newborn infant adjudicated neglected, without specific citation by court to § 1046 [subd (a), par (i)] of the Family Court Act, on the basis of prior adjudication with respect to sibling); Matter of Moran, 14 Misc 2d 630 (newborn infant declared neglected, on basis of prior neglect adjudication as to four siblings, under an earlier version of neglect statute which, however, did not include an evidentiary provision comparable to that contained in § 1046 [subd (a), par (i)] of the Family Court Act.

. See n 12, supra.

. The authorities cited by the court in Matter of Vanessa "F” (supra) do not aid in the resolution of this ambiguity. Apart from referring to a number of provisions in article 10 the court cited only one decision — Matter of "John” Children (61 Misc 2d 347). Matter of "John” Children involved a group of cases raising common questions and issues under a 1969 amendment to the Family Court Act, which amendment, in turn, was repealed by the extensive 1970 revision of article 10. The basic issue in the cases was the constitutionality of the 1969 amendment, insofar as it presumptively mandated removal of custody of children from a parent adjudged to be addicted to narcotics. In two of the consolidated cases, the fact that children had been born with narcotic withdrawal symptoms provided evidence that the mother was actually dependent or in danger of dependency upon narcotics, which dependency under the statute gave rise to a presumption that the children were abused. In the course of discussing the constitutionality of this presumption, the court appeared to focus not on past harm to the infants born with withdrawal symptoms but upon the risk to the infants, apart from these symptoms, that parental addiction creates. In any event, "John” Children, decided as it was under a different version of the statute, and focusing as it did on a different set of issues, is not dispositive of this question.

. The threshold question is whether the neglect statute applies at all to prenatal maternal conduct which results in impairment of the newborn’s condition, or whether, instead, the statute reaches only maternal conduct which occurs after delivery when the child has an existence wholly separate from its mother. Even if, by analogy to developments in the prenatal tort area (see, generally, Prosser, The Law of Torts [4th ed], § 55), it was assumed that injury to the fetus or child in útero, the effects of which come to light after the child is born, could, in some cases, be the basis for a finding of maternal neglect, additional troublesome questions remain. First, since it is clear that a child in útero may be endangered or actually harmed by a broad range of conduct on the part of a pregnant woman, it would appear necessary to limit any application of the neglect statute to prenatal maternal conduct to a narrow and clearly defined class of cases. It may be possible to identify some cases in which it is common knowledge that the maternal conduct in question creates an unreasonable risk of harm to the fetus. However, even a "knew or should have known” standard may prove very difficult to administer. Then, too, there is a question as to whether prenatal maternal conduct which creates risk but does not, in fact, lead to actual harm could be considered the basis for a neglect finding. As was pointed out earlier in this opinion, it is clear that imminent risk of impairment as well as actual impairment is expressly covered by subdivision (f) of section 1012. If, however, subdivision (f) of section 1012 applies to prenatal as well as postnatal maternal conduct, it is questionable whether the creation of unreasonable risk of harm, where no actual harm ensues, could or should be the basis of a neglect proceeding where prenatal maternal conduct is in issue.