OPINION OF THE COURT
Daniel D. Leddy, Jr., J.
In the ongoing tragedy of domestic violence, this court has seen a significant number of cases where physical abuse of an expectant mother by her husband is consciously directed at her unborn child. It is terribly sad that, in this supposedly civilized society, some parents cannot even wait for a child to be born before perpetrating acts of *314 abuse. Against this harsh reality, the Family Court is not powerless to act. Today, this court holds that an order of protection may issue to an unborn child where such is requested by the natural mother and the fetus is within a zone of danger amenable to legal redress.
The natural mother has initiated this proceeding pursuant to article 8 of the Family Court Act. By verified petition, dated March 29, 1984, she alleges that her husband assaulted her three times, hitting her in the head, punching her in the stomach, and throwing her onto the floor. Petitioner is four months pregnant. She has two children, ages 5 and IV2, and she alleges that respondent threatened to take the younger child away from her.[2]
Petitioner seeks an order of protection for herself, her children, and the unborn child. The face of the petition is sufficient to support the issuance of a summons for the respondent husband, and a temporary order of protection for the petitioner and her children. (Family Ct Act, §§ 825, 828.) Similarly, if the child in question were already born, the court could extend its protection to him or her both under article 8 and article 10 of the Family Court Act. (Family Ct Act, §§ 828,1012,1056; Matter of Jason B., 117 Misc 2d 480.) The issue to be resolved is whether the unborn child is likewise within the ambit of the court’s jurisdiction.
The liberty interest protected by the due process clause of the Fourteenth Amendment to the Federal Constitution mandates a freedom of choice in certain matters involving marriage and family life. Thus, a woman’s choice as to whether or not to give birth is constitutionally protected from intrusion by the State within the guidelines set forth in Roe v Wade (410 US 113), and its progeny.
The petitioner herein desires to give birth, a choice entitled to at least the same protection as is extended to the right to abort. (Matter of Mary P., 111 Misc 2d 532.) It may be argued that the protection afforded the petitioner by an order of protection granted on her behalf, necessarily pro- • tects the fetus and that there is no practical need or legal *315 justification to issue an order for the unborn child in its own right. Concededly, almost every act injurious or potentially injurious to the unborn child would, at the same time, be similarly offensive to the petitioner. Nevertheless, this is not always the case. For example, ingestion of certain drugs may be entirely harmless to "the mother while causing damage or even death to the fetus. (See Hughson v St. Francis Hosp., 92 AD2d 131, 137.)
The court also recognizes that, in the ordinary course of events, any violation of an order protecting the fetus would be dependent upon an adult, presumably the mother, filing a petition for redress on the fetus’ behalf. This reality cannot, however, logically defeat an otherwise meritorious application for an order of protection on behalf of the unborn child any more than it could defeat such an application for an infant already born. Where a respondent has violated an order of protection issued to a child that has been born, legal redress is not absolutely dependent upon the willingness of the natural mother to proceed. (See Matter of Irene D. v Anthony D., 113 Misc 2d 561.) To initiate or even continue the violation proceeding, the court is empowered to appoint a guardian ad litem (CPLR 1202) and a Law Guardian (Family Ct Act, § 249). If the unborn child is entitled to an order of protection in its own right, the court could proceed similarly even in the absence of the mother’s desire to proceed or willingness to continue. This is necessarily so since, if the unborn child’s right to an order of protection is established, there would be no rational basis to deprive the unborn of the same enforcement procedures available to the child already born. Among the permissible penalties for violation of an order of protection is a commitment of the respondent to jail for a term not to exceed six months. (Family Ct Act, § 846-a.) The availability of this sanction adds a significant dimension of protection to an unborn child who has received an order of protection in its own right.
Where requested by a natural mother, the issuance of an order of protection to an unborn child would further the purposes of article 8 of the Family Court Act. Those purposes are to “stop the violence, end the family disruption and obtain protection.” (Family Ct Act, § 812, subd 2, par *316 [b].) To implement these stated purposes, “[rjeferrals for counseling, or counseling services,” are available to the parties. (Family Ct Act, § 812, subd 2, par [b].) This Family Court approach to domestic violence differs significantly from that of the criminal courts where the purpose is “prosecution of the offender”. (Family Ct Act, § 812, subd 2, par [c].) Presumably, many petitioners who choose to proceed in Family Court still envision the salvation of their marriage.
In light of the above, it is hard to imagine a more devastating blow to the viability of a marriage than injury perpetrated by a husband on an unborn child whose mother wants to give birth. To exempt such an injury from Family Court jurisdiction would certainly not further the continuance of the marriage and the rehabilitation of the marital relationship. Thus, where requested by the mother, protection of an unborn child is critical to the stated purposes of the Family Court Act.
Two issues remain to be resolved, however. The first is whether the court has the authority to issue such an order to an unborn child. If so, the court must further decide whether the birth of the child is a condition precedent to the order’s enforcement, i.e., would a petition alleging a violation of the order of protection lie on behalf of a child in útero[3]
The Family Court is a court of limited jurisdiction. (NY Const, art VI, § 13; Matter of Borkowski v Borkowski, 38 AD2d 752.) The court’s authority to entertain family offense proceedings is contained in article 8 of the Family Court Act. Section 812 of that statute includes family offenses “between spouses or between parent and child or between members of the same * * * household”. There is no definition of the word “child” found in article 8.
The Family Court Act, as other statutes, must be read as an integrated whole, such that the various sections of the statute retain congruity with each other. (McKinney’s Cons Laws of NY, Book 1, Statutes, § 97; Matter of Fusco v Roth, 100 Misc 2d 288, 290.) In this light, the court will *317 look to other articles within the Family Court Act for guidance in construing article 8.
Subdivision (b) of section 512 of the Family Court Act, concerning paternity petitions, states that “[t]he word ‘child’ refers to a child born out of wedlock.” In Matter of Anne E. S. v Antonio SS. (115 Misc 2d 192), the court relied upon this section to deny a motion by the petitioner for an order directing a human leucocyte antigen (H.L.A.) blood test on the respondent and her unborn child. This denial was based on the court’s reading of section 512 of the Family Court Act. Since the fetus had not been “born” out of wedlock and the word “fetus” appears nowhere in the statute, administration of the blood test would have to wait until after the birth. While ostensibly based on a narrow interpretation of statutory language, such a decision'could also be easily justified by concern for the safety of the fetus and any risk inherent in prenatal blood withdrawal.
In Matter of Genevieve L. v Pierre T. (108 Misc 2d 149), the court dismissed a petition for costs of a pregnancy and the abortion by which it was terminated.[4] Petitioner had claimed respondent was liable for these costs under section 514 of the Family Court Act.[5] The court relied on the article 5 definition of “child” as one “born” out of wedlock; the aborted fetus was never born and, therefore, no liability attached. The court went on to say: “Moreover, there is nothing in article 5 from which the court can infer that the Legislature intended to extend to fetuses the protections bestowed upon children born out of wedlock.” (Matter of Genevieve L. v Pierre T., supra, at p 151.) This language is dicta, because in deciding that a father incurred no liability for expenses of a mother who aborted her pregnancy, it was gratuitous to conclude that no protection of fetuses was intended by the Legislature. In point of fact, analysis of the holdings in Matter of Anne E. S. v Antonio SS. (supra), and Matter of Genevieve L. v Pierre T. (supra), reveals that neither result is incongruous with an infer *318 ence of legislative intention to provide some measure of protection to fetuses (that is, those fetuses whose mothers have not chosen to exercise their right to abortion).
Evidence for this inference may be found in article 5 of the Family Court Act. In allowing paternity petitions to be filed during pregnancy and before birth (Family Ct Act, § 517), the Legislature exhibits a public policy interest in those fetuses whose mothers wish to give birth and have men adjudicated as the fathers. Furthermore, once an order of filiation has been entered, an order of support is to be made by the court, effective “as of the date of the application for an order of filiation” (Family Ct Act, § 545), not as of the date of the child’s birth. Retroactive support is specifically allowed for expenses of the mother in connection with the pregnancy. (Family Ct Act, § 545.) Such expenses would not be allowed but for a concern for the child’s condition before birth. It is posited that the significance of the word “born” in the definition of child (“born out of wedlock”) found in section 512 of the Family Court Act is limited to the marital status of the mother vis-a-vis the putative father at the time of the child’s birth.
Article 10 of the Family Court Act (child protective proceedings), the purpose of which is to facilitate protection of children from injury or mistreatment and safeguard their physical, mental, and emotional well-being (Family Ct Act, § 1011), defines “child” as “any person or persons alleged to have been abused or neglected, whichever the case may be”. (Family Ct Act, § 1012, subd [b].) “Person” is not defined in the Family Court Act (though it is used elsewhere, such as Family Ct Act, § 119, which says, “ ‘infant’ or ‘minor’ means a person who has not attained the age of eighteen years”).
Whether a fetus is a person for the purpose of a child protective proceeding remains an uncharted ocean, though at least one court and one commentator have felt the pull of the current in that direction. In Matter of “Male” R. (102 Misc 2d 1), a finding of neglect was made against a drug-addicted mother whose baby had been born suffering drug withdrawal symptoms, evidence of maternal drug use during the latter stage of pregnancy (Matter of “Male” R., supra, at p 6, n 12; see, also, Matter of Three “John” *319 Children, 61 Misc 2d 347). However, because there was ample evidence of the mother’s continued drug abuse after the baby’s birth, the court did not base its findings on the prenatal maternal behavior which caused impairment of the baby’s condition. Rather, the court found the continued drug abuse sufficient for a neglect finding under section 1046 (subd [a], par [iii]) of the Family Court Act. In dicta, the court discussed the possibility of basing a neglect finding on prenatal maternal conduct leading to impairment at birth, calling it a “difficult question”. (Matter of “Male” R., supra, at p 9.) Also in dicta, another court said, “A new-born baby having withdrawal symptoms is prima facie a neglected baby under article 10 of the Family Court Act”. (Matter of Vanessa F., 76 Misc 2d 617, 619.) Utilizing other available bases for findings, the courts have yet to extend protection under article 10 to neglect or abuse of fetuses born impaired due to prenatal maternal drug use, though it has been suggested that the elements of abuse would be satisfied under such a finding. (Besharov, Practice Commentary, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act, § 1012, p 262.)
Protection of the fetus may be found in other areas of the law. A fetus, past 24 weeks, is afforded legal status and concomitant protection under the Penal Law. Though “person” is defined in subdivision 1 of section 125.05 of the Penal Law as a “human being who has been born and is alive”, section 125.00 specifically includes as a victim, in the definition of homicide, an unborn child over 24 weeks, in addition to a person. The legislative intent here is apparent: if the mother is in the third trimester of pregnancy, acts causing the death of the fetus may be prosecuted as homicide. It would seem that a Legislature which proscribes killing a (24-week) fetus would not intend to preclude the issuance of an order of protection against a third party to prevent actions which could result in injury or death of a fetus.
The Legislature has provided protection for the unborn in the area of property disposition. EPTL provides in section 2-1.3 (subd [a]) that:
“Unless the creator expresses a contrary intention, a disposition of property to persons described in any instru *320 ment as the issue, lawful issue, children, descendants, heirs, heirs at law, next of kin, distributees (or by any term of like import) of the creator or of another, includes * * *
“(2) Children conceived before, but born alive after such disposition becomes effective.”
Although the child’s property interest is not realized until birth, it is recognized while the child is yet a fetus.
The New York State Department of Social Services regulations provide for an increased allowance of $50 additional per month for an indigent pregnant woman’s increased needs beginning in the fourth month of pregnancy. (18 NYCRR 352.7 [k].) This administrative provision reflects a public policy concern for the developing child.
Torts is an evolving area of the law which can be seen as expanding protection of the fetus. The courts have moved from the position that no duty is owed to the unborn to allowing recovery for injury to a fetus who is subsequently born damaged or who, after birth, dies due to prenatal injury. (Prosser, Torts [5th ed], § 55.)
In New York, recovery has been allowed since 1951 for injury to a (viable) fetus, who may sue for damages after birth. (Woods v Lancet, 303 NY 349.) Holding that no cause of action lies for a preconception tort (perforation of the uterus) resulting in injury to a subsequently conceived fetus, the Court of Appeals distinguished Woods v Lancet (supra): “In that case at the time the tort is committed there are two identifiable beings within the zone of danger each of whom is owed a duty independent of the other and each of whom may be directly injured.” (Albala v City of New York, 54 NY2d 269, 272.) Holding that no wrongful death cause of action lies when a child is stillborn, the court said: “The Woods decision * * * simply brought the common law of this State into accord with the demand of natural justice which requires recognition of the legal right of every human being to begin life unimpaired by physical or mental defects resulting from the negligence of another.” (Endresz v Friedberg, 24 NY2d 478, 483.)
Legal protection of the fetus was most recently expanded by the Appellate Division, Second Department, in Hughson v St. Francis Hosp. (92 AD2d 131, supra). The court *321 held that under section 2805-d of the Public Health Law a cause of action may lie for prenatal injury resulting from breach of an independent duty owed to the fetus by the physician for informed consent, even though the statute does not mention fetus. In so holding, the court inferred legislative intent to protect the “infant in útero” from another (Public Health Law, § 2503). This section obligates doctors and midwives to inform pregnant women of any drugs that may be administered during gestation or parturition and any effects these drugs might have on the woman and her baby.
The informed consent statute codifies a treating physician’s duty to “disclose to the patient such alternatives thereto and the reasonably foreseeable risks * * * in a manner permitting the patient to make a knowledgeable evaluation.” (Public Health Law, § 2805-d, subd 1.) In the Hughson case (supra), the Appellate Division construed “patient” in this statute to include a fetus. Of course, the fetus cannot give its informed consent, but this posed no problem for the court, because like any child incapable of giving legal consent for medical treatment, consent may be given by the parent on its behalf.
This Appellate Division holding that the doctor owes two duties of informed consent, one to the mother and one to the fetus, was based on social and medical reality. The social reality is that a mother who wishes to bear a child generally intends to ensure its health; the medical reality is that a fetus can be adversely affected by something that might be harmless or even beneficial to the mother. It should be noted that while the cause of action does not accrue until the child is born, the time of the injury is nowhere limited in the Hughson decision to a “viable” fetus as it was in Woods v Lancet (supra).
Since the common law of this State protects the fetus from negligent acts of a third party, then surely it may be found to encompass protection of the fetus from intentional acts which could cause the child to begin life in an impaired condition. And if monetary recovery may be had after the fact then may not the court provide preventive protection under the family offense statute?
*322 Protection of the fetus, as well as protection of the pregnant woman’s health, has been definitively recognized as a legitimate State interest since Roe v Wade (410 US 113, 162, supra): “We repeat, however, that the State does have an important and legitimate interest in preserving and protecting the health of the pregnant woman * * * and that it has * * * another important and legitimate interest in protecting the potentiality of human life.” (See, also, Planned Parenthood of Mo. v Danforth, 428 US 52, 61.) This significant State interest is present during the entire pregnancy, though it does hot become sufficiently compelling to override the woman’s privacy right until (viability) about the third trimester. (Beal v Doe, 432 US 438, 446; Roe v Wade, supra, at p 162; Maher v Roe, 432 US 464, 478.)
In Maher v Roe (supra), the Supreme Court upheld Connecticut’s Medicaid regulations allowing payment for pregnancy and childbirth expenses but not for nontherapeutic abortions as bearing a rational relationship to the legitimate State interest in potential life. The court first found that the State statutory limitation on Medicaid funding of nontherapeutic abortions did not infringe on a woman’s right to an abortion[6] and then found that encouraging childbirth by fiscal favor was a valid expression of public policy. (See, also, Poelker v Doe, 432 US 519.) In Harris v McRae (448 US 297), the court upheld the Hyde Amendment’s encouragement of childbirth over abortion by disparate funding provisions in the Federal Medicaid law (Social Security Act, tit XIX, US Code, tit 42, § 1396 et seq.). This fiscal preference encouraging childbirth was found to be rationally related to the “legitimate governmental objective of protecting potential life.” (Harris v McRae, supra, at p 325.) The Supreme Court recently reiterated that its holding in Roe v Wade (supra) does not foreclose a legitimate State interest in the fetus in all contexts. (City of Akron v Akron Center for Reproductive Health, 462 US 416, _, n 33, 103 S Ct 2481, 2500, n 33.)
*323 In the case at bar, the State’s interest in protecting the fetus is consistent with the petitioner mother’s desire and right to give birth to a healthy baby and in no way conflicts with her privacy right to freely decide what to do with her pregnancy. Exclusion of the fetus from protection under a remedial statute “serves only to immunize a wrongdoer from liability”; it does not serve to further the woman’s constitutional right to privacy.[7] In an article 8 proceeding, the court is solely concerned with the fetus for the purpose of effectuating the statutory protection of a person from harm by another member of the family or household. (Family Ct Act, § 812.) In a statutory context not involving the mother’s privacy interest, “person” may have a different legal meaning than in the abortion context.[8]
Furthermore, how could the mother’s privacy right be invoked to insulate a third party’s behavior[9] from the court’s family offense jurisdiction? The right to abort is the mother’s not the father’s.[10] Invalidating a spousal consent provision of Missouri’s abortion statute, the Supreme Court held, “the State cannot delegate authority to any particular person, even the spouse, to prevent abortion during that same period [first trimester].” (Planned Parenthood of Mo. v Danforth, 428 US 52, 69.) Therefore, this court believes that a father should not be allowed, by violent actions against the mother, to cause such a result.
As delineated above, protection of the fetus, when the mother’s constitutional privacy right is not involved, is not precluded and is in fact a recognized legitimate State interest. New York State legislation, regulations and case law, discussed supra, manifests this State’s interest in protecting potential life. Accordingly, an order of protec *324 tion on behalf of a fetus, in an appropriate case, is within the Family Court’s statutory jurisdiction under article 8 of the Family Court Act, and consistent with the statutory purpose.
The issue remains whether an order of protection granted to a fetus under article 8 may be enforced prior to the birth of the child. Although such an order has inherent value in deterring harmful conduct, this court would be reticent to issue an order incapable of enforcement at the time of a violation. Turning again to the tort analogy, the birth of the child is a prerequisite to the tort cause of action for injury to a fetus: the cause of action does not accrue unless and until the child is born.[11] This time limitation is supported by proof problems of causation and difficulty in ascertaining damages.[12] Injury is an essential element in the tort cause of action. These after-the-fact considerations of actual injury are not, however, crucial in the issuance or enforcement of an order of protection.
Under article 8 of the Family Court Act, the focus is on prevention of injury. The stated purpose of a family offense proceeding is to “stop the violence, end the family disruption and obtain protection.” (Family Ct Act, § 812, subd 2, par [b].) An order of protection may be issued for conduct which would not necessarily lead to physical injury, such as harassment or menacing. (Family Ct Act, § 812, subd 1.) An order of protection may involve behavior not directly connected with violence causing physical injury, such as giving proper attention to the care of the home or refraining from acts of omission that tend to make the home improper for a child. (Family Ct Act, § 842.) Furthermore, an order of protection may mandate “reasonable conditions of behavior”. (Family Ct Act, § 842.) In short, there is an injunctive quality found in the family offense proceeding not present in the tort proceeding with its compensatory nature.
Enforcement of an order of protection is effected by a finding of a willful violation of the court’s order. (Family Ct Act, § 846; Besharov, Practice Commentary, McKinney’s *325 Cons Laws of NY, Book 29A, Family Ct Act, § 846, p 202.) The remedies available to the court for violation of an order of protection are modification of the order of protection, issuance of a new order of protection, and incarceration of the respondent for up to six months. (Family Ct Act, § 846-a.) It is clear that these remedies are remedies for failure to obey the court’s order. Incarceration up to six months for willful failure to obey the order of protection is the most serious remedy available. The other remedies found in section 846-a provide further protection to the petitioner. None of these remedies serves to compensate for a particular injury which may occur when an order of protection is violated. In fact, there does not even have to be any injury for there to be a violation of an order of protection if the respondent willfully violated one of the order’s provisions.
It should be noted that the article 8 proceeding is a civil proceeding and that criminal court has concurrent family offense jurisdiction for the purpose of prosecuting and punishing the offender. (Family Ct Act, § 812; see, also, Family Ct Act, § 847, allowing the petitioner to proceed in Criminal Court when a Family Court order of protection is violated; Family Ct Act, § 813, permitting the Family Court to transfer proceedings to Criminal Court.)
Since injury is not a prerequisite to enforcement of a Family Court order of protection, the tort rationale supporting birth as a prerequisite to a cause of action is not applicable to an article 8 proceeding. This court finds that birth of the child is not a condition precedent to enforcement of an order of protection issued on behalf of the fetus. Rather, the public policy behind family offense legislation requires expeditious judicial action to prevent injury whenever possible.
In light of the foregoing, the court holds that an order of protection on behalf of the fetus is within its jurisdiction and appropriate in this case.

. The petitioner informed the Department of Probation that the respondent has a history of psychiatric problems and has told her he was trying to force her to have a spontaneous abortion.

. This is a necessary consideration since the court will not issue orders that cannot be enforced.

. Buts Be Matter of Gladys C. v Robert L. (61 Misc 2d 381), holding that the costs of a therapeutic abortion (performed after a paternity petition was filed) may be had under section 514 of the Family Court Act, construed liberally as a remedial statute.

. “The father is liable to pay the reasonable expenses of the mother’s confinement and recovery and such reasonable expenses in connection with her pregnancy as the court in its discretion may deem proper.” (Family Ct Act, § 514.)

. The nature of the right to abortion granted women in Roe v Wade (410 US 113) has been misunderstood: This activity, abortion in the first trimester, is part of a woman’s fundamental right to privacy and as such may not be unduly interfered with by the State. This right is not an absolute right to abortion on demand. (Maher v Roe, 432 US 464, 473-475.) There is no constitutional right to the financial resources which may be needed to exercise the right to abortion. (Harris v McRae, 448 US 297.)

. Kader, The Law of Tortious Prenatal Death Since Roe v. Wade, 45 Mo L Rev 639, 657.

. Reilly, A Viable Fetus is a “Person” for Purposes of the Rhode Island Wrongful Death Act, 46 U of Cinn L Rev 266,273; see, also, Parness and Pritchard, To Be or Not to Be: Protecting the Unborn’s Potentiality of Life, 51 U of Cinn L Rev 257; 45 Mo L Rev 639.

. See 46 U of Cinn L Rev 266, 273.

. See Matter of L. Pamela P. v Frank S., 59 NY2d 1, 6-7: “[Respondent's constitutional entitlement to avoid procreation does not encompass a right to avoid a child support obligation simply because another private person [the mother] has not fully respected his desires in this regard. However unfairly respondent may have been treated by petitioner’s failure to allow him an equal voice in the decision to conceive [and bear] a child, such a wrong does not rise to the level of a constitutional violation.”

. This is not true in all jurisdictions and has been the subject of criticism, because it results in a cause of action where injury is caused but, absurdly, not where the injury is so severe as to cause fetal death. (46 Ginn L Rev 266, 275.)

. See Prosser, Torts [5th ed], § 55.