*3 OPINION OF THE COURT
Jeffry H. Gallet, J.
This child protective proceeding concerns an infant who was born suffering from Fetal Alcohol Syndrome (F.A.S.). At issue is whether a mother’s conduct prior to the birth of a special needs child may provide an evidentiary basis for a determination of neglect and if isolated, but uncontroverted, evidence of a father’s misuse of alcohol is sufficient to prove his potential for harmful behavior and establish neglect of that child.
THE FACTS
Natasha was born on January 11, 1989 and transferred to the Beth Israel Medical Center (B.I.M.C.) for treatment, suffering from F.A.S. That diagnosis is based, according to the testimony by Dr. Steven Kandall, a pediatrician at B.I.M.C. with a specialty in neonatology and extensive experience with drug- and alcohol-damaged babies, on the identification of a symptom in each of three groups — prenatal and postnatal growth problems, congenital malformations and psychoneurological behavioral dysfunction. Natasha’s low birth weight of 1,800 grams has been followed by continued poor growth and development. She suffers some facial malformations, a small head and congenital heart disease, all symptoms from the second group. Her psychoneurological dysfunction is extreme irritability — one of the worst cases that Dr. Kandall had ever seen. The child does not allow herself to be handled and she does not suck. Tube feedings were the only available means of nutrition for the child at the age of eight months.
Dr. Kandall testified that F.A.S. is caused by a woman’s consumption of alcohol during pregnancy, either by episodic binge drinking or the regular intake of 2 to 3 ounces of alcohol per day. He attributed the baby’s congenital malformations to the mother’s intake of alcohol during the first trimester and the infant’s psychoneurological behavior to alcohol consumption by her mother in the second and third trimesters of pregnancy. The mother’s own testimony confirms substantial alcohol use during those periods.
Natasha has significant special needs and requires a very supportive environment upon release from the hospital. Dr. Kandall opined a need for positive interaction with her caretakers, continuing rehabilitation therapy and medication for a very serious heart lesion. The caretakers would also need training in helping the child to develop her oral reflexes so *4 she can learn to eat normally and until that is achieved the caretakers would be required to continue tubal feeding. Because of her F.A.S., she has very specific special needs. Her caretakers must be sufficiently able, sufficiently organized, and sufficiently alert to meet those needs or the child will be at risk of substantial, if not fatal, injury.
The doctor’s prognosis for the child was guarded. He considered it likely that Natasha would suffer moderate retardation and have a need for open heart surgery.
This neglect petition was filed against the baby’s parents after a report of suspected child neglect was filed by a B.I.M.C. social worker, citing the postbirth admission of daily use of alcohol by both the mother and father.
Neither parent was enrolled in a rehabilitation program at the time of the filing of the petition.
ARGUMENTS
Petitioner argues that both parents misused alcohol to the point of the loss of control of their actions and that they present an imminent risk of impairment to the child because of their inability to provide proper supervision. (Family Ct Act § 1012 [¶] [i] [B].) The parents both maintain that the petitioner has failed to produce evidence of the misuse of alcohol that could be expected to create a loss of self-control.
Respondent father cites his never having the care or custody of the child and argues that testimony regarding two isolated incidents of inappropriate use of alcohol is insufficient to prove neglect. He relies on the hospital social worker’s negative response to whether she observed that the father was disoriented at the hospital interview to argue that petitioner has failed to show neglect by not establishing the father suffered a substantial state of stupor, unconsciousness, intoxication, disorientation or substantial impairment of judgment.
The respondent mother notes that most of the evidence before me of her misuse of alcohol refers to prenatal drinking. She argues that the statutory indicators of neglect must be pleaded and proved and cannot be presumed on the basis of her prenatal drinking. She maintains that the actual harm to the child was the result of prenatal conduct and that the petitioner has failed to connect that behavior with conduct that presently places the child at risk, citing Matter of Fletcher (141 Misc 2d 333 [Fam Ct, Bronx County 1988]) and *5 Matter of "Male” R. (102 Misc 2d 1 [Fam Ct, Kings County 1979]).
The Law Guardian argues that the same two cases, in effect, support a finding of the mother’s continued misuse of alcohol to an extent that she would place the child in imminent danger of impairment. In addition, the Law Guardian believes that proof of the mother’s failure to exercise a minimum degree of care during her pregnancy, that is her continued drinking, causing the physical, mental and emotional impairments to the child of F.A.S., also establish her neglect.
THE LAW

In General

Soon after her birth, Natasha was transferred to the Neonatal Intensive Care Unit (I.C.U.) at B.I.M.C. She remains in the Neonatal I.C.U. and has never been under the care or custody of either parent. This circumstance, however, does not effect whether a neglect finding can be made based on the potential for harm to a child that a parent’s behavior currently presents. (Family Ct Act § 1012 [¶] [i].)
As this court noted in Fletcher (supra, at 335): “[A]ctual custody of a child is not always required to find child neglect. For example, a failure to exercise a minimum degree of care may be established upon proof of the abuse or neglect of a sibling (Matter of Christina Maria C., 89 AD2d 855 [2d Dept 1982]; Family Ct Act § 1046 [a] [i]); or the developmental disabilities of the child (Matter of Alfredo HH., 84 AD2d 860 [3d Dept 1981]); or a parent’s incapacitating mental illness (Matter of Eugene G., 76 AD2d 781 [1st Dept 1980]). Nor would actual custody be necessary where there is proof of regular and excessive drug use before and after birth, in combination with the statutory evidentiary rule that repeated misuse of a drug or alcohol, to an extent that would be expected to produce an inability to provide supervision and care, establishes a prima facie case of neglect. (Matter of 'Male’ R., 102 Misc 2d 1 [Fam Ct, Kings County 1979]; Family Ct Act Section 1046 [a] [iii].)”
The Family Court Act defines a neglected child in relevant part as one:
“whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent * * * to exercise a minimum degree of care * * *
*6 “(B) in providing the child with proper supervision or guardianship * * * or by misusing alcoholic beverages to the extent that he loses self-control of his actions”. (Family Ct Act § 1012 [¶] [i]; emphasis added.)
A prima facie case of neglect can be established by proof of repeated misuse of alcohol that could be expected to produce in the user: "a substantial state of stupor, unconsciousness, intoxication, hallucination, disorientation, or incompetence, or a substantial impairment of judgment, or a substantial manifestation of irrationality” (Family Ct Act § 1046 [a] [iii]).
In addition to the dysfunctions of a parent, the neglect finding process must also consider any special needs of the child. A child’s need for vigilant observation of a feeding process, regular medication for a serious heart condition and positive interaction with caretakers who are receptive to training to provide at-home therapy raises the standard for the “exercise of a minimum degree of care”. (Family Ct Act § 1012 [¶] [i].) Less than the loss of self-control under the influence of alcohol described supra is sufficient to establish the impairment of parenting abilities in “providing * * * proper supervision” (Family Ct Act § 1012 [¶] [i] [B] [emphasis added]) of a child who requires intense supervision and constant care.

Respondent Mother

The mother admits to the regular consumption of four ounces of alcohol every other day after learning of her pregnancy, although she conceded being told of the harm this could do to the fetus she carried. That use led to the severe physical and neurological disabilities the child suffers today.
However, a mother’s prenatal conduct alone cannot be the basis of a neglect finding. Nor is it enough to claim abuse without showing a specific detriment to the newborn. (Matter of Fletcher, supra; see also, Matter of Randall Children, 96 Ore App 673, 773 P2d 1348 [1989].) The mother’s prenatal conduct must be connected to a postbirth risk of harm.
Fletcher (supra) held that article 10 did not create an in útero neglect action. The law was not enacted to impact on a women’s bodily integrity or intrude upon rights of privacy during her pregnancy. Its aim is not to monitor or punish adult conduct but to protect children. The use of drugs or alcohol or cigarettes during pregnancy does not in and of itself *7 establish an inability to properly care for and supervise the child that is born.
The mother here admitted to hospitalization for alcohol treatment about 3 to 4 years ago to B.I.M.C.’s social worker and at trial, enrollment in Alcoholics Anonymous and to being alcohol free for about six months after treatment. At trial she stated that before she learned of her pregnancy in her fourth month she drank every day. After her doctor warned her that drinking might cause harm to the baby and to her own liver condition her response was to cut down rather than totally stop drinking. She explained: "I tried to stop drinking alcohol completely and it couldn’t be done. * * * Because its hard. * * * Hard to stop drinking just like that.”
The mother’s inability to discontinue her alcohol use, even after being warned that it could harm both the fetus and herself is admissible on the issue of alcohol addiction and her ability to discontinue alcohol use if she is to care for the child. Indeed, repeated past behavior is a substantial predictor of future behavior.
As in Matter of "Male” R. (supra), we have a history of substance abuse by admission which is confirmed by the child’s symptomatology. Unlike the positive toxicology of Fletcher (supra) which says nothing more than a drug was used by the mother shortly before giving birth, Natasha’s condition confirms the regular, excessive use of alcohol for much of the nine-month period prior to birth.
A self-described alcoholic respondent mother stated a desire to stop drinking to the hospital social worker but did not want the assistance of a rehabilitation program. She used alcohol as a "pain-reliever” on the morning of her meeting with the social worker to discuss her newborn’s special needs.
The mother had acknowledged the difficulty she had experienced in halting the use of alcohol during pregnancy but was unwilling to accept help in fighting her alcohol dependency.
The mother’s prenatal misuse of alcohol and her child’s condition showing such misuse continued throughout her pregnancy make it reasonable to infer continued use after birth. (See, Matter of "Male” R., supra, at 6, n 12.)
The issue here is not the mother’s prenatal alcohol abuse. Rather it is whether her alcohol use during pregnancy, to *8 gether with the other evidence in this case, prove by a preponderance of the evidence that this child, with her special needs, would be in danger if placed in the mother’s care. The answer can only be in the affirmative.

Respondent Father

As to the father, very little evidence was introduced. The hospital social worker Susan Gold testified to only two post-birth contacts with him, both times observing his intoxication. At the morning interview soon after the birth of the child she smelled liquor on his breath and noted his slurred speech. He admitted his daily use of alcohol to Ms. Gold and as a self-described alcoholic stated a plan to cut down on his alcohol intake but not to cease drinking. In addition, the mother testified to regularly consuming alcohol with him.
The father exhibited a loss of self-control at the hospital interview by his nonresponsive, tangential mutterings about his war experiences, the shapeliness of the social worker’s legs and her availability to see him after work. At their second contact, the father admitted drinking before coming to visit the child some eight days after the first interview when Ms. Gold informed him and his wife of the ban on visitors who had been drinking. His speech was again slurred.
This court finds that his conduct establishes an impairment of judgment and manifestation of irrationality to establish a prima facie case of neglect pursuant to Family Court Act § 1046 (a) (iii). He failed to testify to deny, explain or limit the import of his behavior and that failure allows me to draw the strongest inference against him the evidence allows. (Matter of Tammy L., 132 Misc 2d 722 [Fam Ct, Onondaga County 1986]; see also, Noce v Kaufman, 2 NY2d 347 [1957] [for a discussion of the inference which may be drawn from a party’s failure to testify].) The petitioner has established regular and inappropriate drinking by the father which would place a child like Natasha in substantial risk of harm under his care and supervision.
THE DECISION
Petitioner has met its burden of showing that under the *9 care and supervision of her father and mother this infant, this child, with very special needs, would be in imminent danger of harm. (Family Ct Act § 1012 [f| [i] [B]; § 1046 [a] [in].)
Therefore, a finding of neglect is made against both parents in this proceeding.