In the Matter of Scott L., Appellant, v Bruce N., Respondent.

First Department, March 17, 1987

## APPEARANCES OF COUNSEL

*Herman H. Tarnow (Gretchen Leitzell Johnson* with him on the brief), for appellant.

*David E. Pugh* of counsel *(Lester Wallman* and *Susan L. Strawgate* with him on the brief; *Wallman & Kramer,* attorneys), for respondent.

*Anne Reiniger* of counsel to The New York Society for the Prevention of Cruelty to Children, guardian ad litem on behalf of the children.

## OPINION OF THE COURT

MILONAS, J.

Petitioner, Scott L., seeks custody of his two nieces, Meredith and Marnee N., urging that, pursuant to *Matter of Bennett v Jeffreys* (40 NY2d 543), extraordinary circumstances exist such that it is in the children's best interests that custody be awarded to him. Respondent, Bruce N., the girls' natural father, has filed a cross petition asking that he be granted sole custody of the children, who were born in wedlock to him and the late Laurie Beth N. The couple divorced in 1981, and thereafter the mother moved to Florida with the girls, then aged three and four years. Although respondent remained in New York, he apparently did live with the mother and children in Florida in the summer of 1982. He then visited with his children no more than twice each year. The maternal relatives, while residing in New York, maintained intimate connections with the children and their mother and often visited Florida. There is considerable evidence that the girls are close to their maternal relatives and consider themselves to be part of the same family. Their relationship with their father, on the other hand, seems to be quite strained.

On November 19, 1985, Laurie Beth N. committed suicide. Her children were then returned to New York by the maternal relatives and have been living with petitioner, their maternal uncle. They have also been in daily contact with their maternal grandparents. Petitioner has provided for the girls' physical, educational and emotional needs. They have been enrolled in a neighborhood private day school. Since early in 1986, due to her fragile mental state, the older girl, Meredith, has been attending weekly psychotherapy sessions with a child psychiatrist.

The instant petition was filed on January 7, 1986. On February 6, 1986, the court issued a temporary order of custody to petitioner based upon a recommendation by the New York Society for the Prevention of Cruelty to Children, which had conducted personal interviews with the children and consulted Meredith's therapist. At that time, the girls expressed a desire to remain with their uncle and demonstrated great anxiety at the prospect of being compelled to live with their father.

In June and July of 1986, a hearing was held to determine if extraordinary circumstances existed to warrant an inquiry into the best interests of the children. In that connection, the focus was on whether respondent's extensive history of multiple drug addiction constituted such an extraordinary circumstance and whether Meredith's precarious mental health was also an extraordinary circumstance. The children visited their father on weekends during the course of the proceedings and exhibited resentment at this enforced visitation. They complained about his insensitive manner of relating to them, and the court-appointed psychiatrist, Dr. Cheryl Riess, found that both the father and the paternal grandparents had failed to show the feelings of love and acceptance which the children desperately crave.

In the spring of 1986, Dwayne N., the girls' paternal uncle, who resided in the home of the paternal grandparents, died of a self-inflicted gunshot wound to the head. Meredith was especially traumatized by her uncle's suicide. After this occurrence, her adjustment and behavior, which had been improving since the death of her mother, deteriorated sharply. Meredith developed suicidal fantasies. According to Dr. Riess, there were occasions when Meredith was very specific about wishing to die and join her mother and even thought up a suicide plan, which included procuring a kitchen knife and stabbing herself. Dr. Riess also stated that if someone indicates a desire to die, the suicide threat must be taken very seriously, and outside intervention is mandated. In the doctor's opinion, it is essential that Meredith, who is disturbed and potentially suicidal, continue with her therapy.

Dr. Riess further testified that Meredith was afraid of her paternal grandparent's home, where her uncle had committed suicide, because she had some vague feelings that her paternal grandmother and the house itself had caused her Uncle Dwayne to kill himself. Thus, Dr. Riess concluded that it

would be harmful to the child's emotional condition to require her to live in her father's home and that she had an obsessive fear of being trapped there. Dr. Riess also stated that having experienced the suicides of both her mother and uncle, her own suicide is more acceptable to Meredith. Further, respondent himself suffers from depression which includes suicidal ideation and, in July of 1985, was taking medication for this condition.

Meredith's school records were introduced into evidence. They indicated that while her academic and social adjustment grades remained unchanged, from February through June of 1986 her school performance declined in several respects. The child had a loss of concentration and appeared preoccupied, and she had deteriorated in motor development, physical fitness and social skills. Dr. Riess cautioned that despite the fact that the changes were not drastic, the psychological state preceding suicide can be quite masked, particularly in children. She strongly recommended that the girls not be removed from their present home, asserting that placement with the father would be harmful to the children.

In addition, the father has a long background of drug and alcohol abuse, as well as drug and alcohol related arrests. He is presently enrolled in a drug treatment program, but there is evidence of continuing drug use as recently as 1986. Dr. Riess was doubtful of the father's ultimate recovery in view of his persistent drug use. Another witness, Dr. Murray J. Cohen, a psychiatrist experienced in treating and studying substance abusers, provided a negative prognosis as well. He explained that it is more difficult to treat polysubstance users such as respondent than those who rely upon a single drug. Dr. Cohen also stated that an abuser in respondent's position must abstain totally for three to five years before he can be considered out of imminent danger from drug use. The doctor, after reviewing the father's toxicology report, offered his view that "it is not the toxology of a stable person" and is, rather, symptomatic of significant substance abuse.

The court, however, notwithstanding the overwhelming proof to the contrary, determined that there were no extraordinary circumstances present which would justify an inquiry into the best interests of the children. Virtually ignoring the psychiatric testimony, the Judge did not find anything particularly abnormal about Meredith's functioning beyond the fact that she was still mourning her mother and had not fully accepted the permanence of her loss. Consequently, the court

seems to have completely disregarded the evidence of Meredith's suicidal tendencies and the clear indication that the child does not represent a typical case of childhood depression. According to expert opinion, children, especially girls, of Meredith's young age (she is nine years old) do not commonly conceive of such concrete suicidal fantasies as involve inflicting upon oneself the violent act of stabbing with a kitchen knife. Similarly, the fact that Meredith does not externalize or act out her hostility or depression does not mean that she is not suicidal. Quite the opposite is likely to be the situation. Her outward compliance and obedience may simply indicate that she is more apt to direct all of her pain and anger at herself rather than at others. Further, Meredith, along with her sister, have now had two close relatives, including their mother, kill themselves. Psychologists contend—and statistics validate—that the most accurate prediction of suicidal behavior is a family history of suicide. Yet, the court did not appear to perceive anything significant in any of this.

Both girls, Meredith and Marnee, have expressed great fear and distress at the prospect of being forced to leave the care and custody of their uncle, whom they love and are close to, for that of their father, with whom they have an extremely poor relationship. There is strong evidence that both girls dread being removed to their father's home and that Meredith particularly has developed a phobic fear of the house in which he resides, since that is where her uncle's suicide took place. The court-appointed psychiatrist emphasized that to take Meredith away from the people whom she loves and with whom she is meaningfully connected, her maternal uncle and grandparents, and, instead, send her to live with a father with whom she feels little affection and trap her in a house that terrifies her with a paternal grandmother whom she dislikes, would pose a significant danger that she might attempt to join her mother through suicide. Certainly, the very real possibility of this should not have been overlooked by the trial court.

Moreover, Meredith's precarious emotional condition must be coupled not only with a consideration of both girls' aversion to living with their father, but also with the father's long record of multiple drug addiction and related arrests, the guarded prognosis for his ultimate recovery, his depressed mental state and his impaired relationship with his children. Under these circumstances, it was not sufficient merely to conclude, as did the Family Court Judge, that since respondent is the girls' father, Meredith and Marnee should be given

the opportunity to form with him "the special bond which children have with a custodial parent" and that, while respondent's long-range recovery is uncertain, the risk of further disruption to the children's lives is a reasonable one to assume in light of the fundamental presumption that a parent has a right to rear his own children. Indeed, if the instant matter does not present the sort of extraordinary circumstances contemplated by the Court of Appeals in *Matter of Bennett v Jeffreys* (40 NY2d 543, *supra),* it is difficult to conceive of a situation that would. Therefore, the Family Court should have directed that a hearing be conducted concerning the best interests of the children. In that respect, Meredith's treating psychiatrist, who did not appear at the prior hearing, should be called as a witness, and the subject of both children's emotional condition should be explored at great length before another Judge.

Therefore, the order of the Family Court, New York County (Sara P. Schechter, J.), entered on July 29, 1986, which dismissed the petition on the ground that petitioner has failed to demonstrate the existence of extraordinary circumstances warranting inquiry into the issue of the best interests of the subject children and awarded custody of the children to respondent, should be reversed, on the law and the facts, and the matter remanded for an expedited hearing before another Judge, concerning the best interests of the children, without costs or disbursements.

KUPFERMAN, J. P., SULLIVAN, ROSS and KASSAL, JJ., concur.

Order, Family Court of the State of New York, New York County, entered on or about July 29, 1986, unanimously reversed, on the law and the facts, and the matter remanded for an expedited hearing before another Judge, concerning the best interests of the children, without costs and without disbursements.