█ In the Matter of ALFREDO S., Appellant, v NASSAU COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent.—In a child custody proceeding pursuant to Family Court Act article 6 for custody of Lorraine S., the petitioner appeals from an order of the Family Court, Nassau County (Capilli, J.), dated April 27, 1989, which, after a hearing, dismissed the petition.

Ordered that the order is reversed, on the law and the facts, without costs or disbursements, the petition is granted, and custody of Lorraine S. is awarded to the petitioner.

This proceeding involves a natural father's effort to gain custody of his daughter Lorraine, born out of wedlock on July 31, 1988, from the respondent Nassau County Department of Social Services (hereinafter the Department) to whom the child has been entrusted since her birth pursuant to her natural parents' consent. Lorraine was born with a positive toxicology for cocaine and exhibiting withdrawal symptoms. Neglect proceedings were commenced against the natural mother based upon her admitted drug addiction. Although the petitioner was identified in the neglect petition as the infant's father, he was not a named respondent. The natural mother eventually consented to a finding of neglect.

Meanwhile, on August 5, 1988, only three days after he consented to the child's temporary placement with the Department and five days after the child's birth, the petitioner brought a proceeding for an order of filiation declaring him to be Lorraine's natural father and also sought custody. After an order of filiation was entered, the petitioner commenced the instant proceeding for custody of his daughter on September 8, 1988. Following a hearing at which the only witnesses were two caseworkers who were involved in the neglect proceedings initiated against the natural mother, the Family Court concluded, *inter alia,* that the father had failed to demonstrate that he would be a proper custodian for the infant and the child would be at risk in the petitioner's custody. The court's determination appeared premised primarily upon the father's admission to the caseworkers that until several months prior to Lorraine's birth he was an occasional recreational user of cocaine and further upon the testimony of one of the caseworkers that the petitioner's home was in need of repairs. Notably, the court's decision was contrary to the recommendation of the Law Guardian appointed by the court to represent the child's interest. This appeal ensued.

The critical issue presented is whether a sufficient demonstration of extraordinary circumstances has been made to justify an inquiry into the child's best interests. In denying the petitioner father's application for custody, the Family Court erroneously placed the burden upon him to demonstrate his fitness as a parent. The principles governing custody disputes between a natural parent and a third person are firmly established in the decisional law. A natural parent has a claim to the custody of his or her child "superior to that of all others, unless he or she has abandoned that right or is proved unfit to assume the duties and privileges of parenthood" *(People ex rel. Kropp v Shepsky,* 305 NY 465, 468; *see, Matter of Male Infant L.,* 61 NY2d 420, 426). Custody disputes of this kind involve a two-step analysis. First, there must be a threshold showing of "surrender, abandonment, persisting neglect, unfitness or other like extraordinary circumstances" to justify the State's intrusion into the family domain *(Matter of Bennett v Jeffreys,* 40 NY2d 543; 544; *see, Matter of Male Infant L., supra,* at 427; *cf., Matter of Ronald FF. v Cindy GG.,* 70 NY2d 141, 144). Until the threshold of "extraordinary circumstances" has been satisfied, the second prong of the analysis, *i.e.,* the question of the child's best interests, is not reached *(see, Matter of Male Infant L., supra).* In this regard, the burden of demonstrating the existence of "extraordinary

circumstances" so as to trigger the need for a best interests hearing is upon the party seeking to deprive the natural parent of custody (see, Matter of Darlene T., 28 NY2d 391, 394; Matter of Nadia Kay R., 125 AD2d 674, 676).

Our review of the record reveals that the Department has failed to carry its burden. There is no evidence of any of the extraordinary circumstances enunciated in Matter of Bennett v Jeffreys (40 NY2d 543, supra). Specifically, the Court of Appeals in Matter of Bennett v Jeffreys (supra, at 544, 548) held that "the prolonged separation" of the child and the natural parent may constitute an extraordinary circumstance requiring inquiry into the best interests of the child. While it is true that the petitioner initially relinquished provisional custody of the child to the Department at a time when there was no order of filiation upon which he could base a claim to custody, and the child has not been in her father's custody since her birth more than two years ago, the extended period of separation was not due to an abandonment of the child by the petitioner nor even to a lack of interest or concern in the child's welfare on his part. Indeed, nearly from the day of the child's birth, the petitioner has persisted in his efforts to obtain custody. The period of separation is in large measure attributable to the pace of the instant proceedings, a circumstance over which the petitioner could exercise virtually no control. The Department should not be permitted to deprive the natural parent of custody over an extended period of time and then oppose the custody application of the parent, claiming the prolonged separation constituted an "extraordinary circumstance." Adopting such a position would provide an incentive for the nonparent respondent to prolong the custody proceeding in the hope of gaining an advantage over the natural parent. In sum, under circumstances such as these, although the initial relinquishment of custody was with the natural parent's consent, the separation between the natural parent and the child does not rise to the level of an extraordinary circumstance triggering a best interests inquiry (see, Matter of Male Infant L., supra, at 428-429).

Additionally, the record does not clearly demonstrate that the petitioner was unfit to assume the duties of parenthood. The evidence showed that the petitioner was gainfully employed, serious about his responsibilities as a father, and lived in a stable environment with his mother and sister, the latter of whom had agreed to care for the petitioner's daughter if he gained custody. The one-family, three-bedroom house where the petitioner resided was described in the hearing testimony

of one of the caseworkers as in need of repair but "neat and clean". Nothing in the record supports the Family Court's finding that the house was "dilapidated". Although the petitioner admitted to the caseworkers that he had been an occasional recreational drug user, he claimed to be drug-free, having discontinued his drug usage four months prior to the child's birth. The Department proffered no evidence that the petitioner was then or ever had been addicted to drugs, was a regular or habitual user of drugs, or was otherwise chemically impaired.

Our dissenting colleagues, while recognizing the apparent inequity in holding a father responsible for a mother's prenatal drug use which resulted in an at-birth positive toxicology for cocaine in the child, nevertheless propose that very result. The dissenters conclude that the mother's prenatal drug use, the child's positive test result for cocaine, and the father's admitted infrequent use of cocaine during a period more than four months prior to the child's birth, constitute sufficient extraordinary circumstances to warrant remitting this matter to the Family Court, Nassau County, for a hearing to determine custody solely based on the best interests of the child. The cases upon which our dissenting colleagues rely in urging this result involve primarily statutory causes of action for neglect based upon parental *regular and excessive* prenatal and postnatal drug and/or alcohol use *(see, Matter of Smith,* 128 Misc 2d 976; *Matter of "Male" R.,* 102 Misc 2d 1; *Matter of Vanesa "F",* 76 Misc 2d 617). A child's positive testing for drugs at birth considered in combination with other evidence indicative of *repeated* use of drugs by the mother has been held to establish a prima facie case of neglect *(see, e.g., Matter of Theresa J. v Patricia J.,* 158 AD2d 364; *Matter of Stefanel Tyesha C.,* 157 AD2d 322; *Matter of Fletcher,* 141 Misc 2d 333). In neglect cases, Family Court Act § 1046 (a) (iii) further provides that a prima facie case of neglect can be established by proof of *repeated* use of a drug that could be expected to produce in the user "a substantial state of stupor, unconsciousness, intoxication, hallucination, disorientation, or incompetence, or a substantial impairment of judgment, or a substantial manifestation of irrationality." Once Family Court Act § 1046 (a) (iii) has been triggered, an adjudication of neglect can be based upon proof that there exists a substantial risk of impairment if the child is in the subject parent's care (Family Ct Act § 1012 [f]; *Matter of "Male" R., supra,* at 8). In this regard, evidence of prenatal use of drugs may support a finding of neglect on the theory that the parent would be

unable to provide adequate supervision and care subsequent to the birth of the child because of the likelihood of the continued use of drugs *(see, Matter of Stefanel Tyesha C., supra,* at 329-330; *Matter of Milland,* 146 Misc 2d 1, 6-8; *Matter of "Male" R., supra; see also, Matter of Vanesa "F", supra).*

Since the Department never brought a neglect petition against the petitioner, we seriously question the relevance of borrowing the reasoning adopted in cases involving the question of neglect. However, what is eminently clear is that even a prima facie finding of neglect must be based upon proof of *repeated* prenatal drug use from which one may infer postnatal drug use sufficient to pose a risk of danger to the child after birth. The dissenters would have us find exceptional circumstances sufficient to warrant our interference in the family based upon the father's admission that he used cocaine at a time remote from Lorraine's birth. This finding is based upon a somewhat distorted analysis of the record. Consequently, we simply cannot share their view.

In the first instance, the dissenters intimate that the father used drugs during the period he cohabited with the mother. However, the record is equivocal on this point. There is testimony from one of the caseworkers that the father admitted using cocaine and that he claimed he separated from the mother because of her drug use. Conversely, in the probation report the mother denied ever living with the petitioner but claimed the main conflict between the petitioner and herself concerned her drug use. The mother claimed the petitioner had no history of drug or alcohol abuse. The probation report further reflects a statement of the father that he suspected the mother had a drug problem but she never used drugs in his presence.

On this meagre record we simply cannot conclude that the father's occasional use of drugs prior to the child's birth renders him an unfit parent. Nor may we attribute responsibility to the father for the mother's prenatal drug use, her admitted addiction to cocaine, and the finding of neglect entered against her, and thereby leap the logical gap in this reasoning to find the presence of extraordinary circumstances sufficient to mandate a best interests inquiry.

The petitioner has continually exhibited an interest in and concern for the child, particularly demonstrated by his persistence in seeking to obtain custody. The infrequency of the petitioner's visitation with the child should not be held against him in light of testimony that he did not have a car

and the difficulty of traveling in Nassau County without one. It also bears noting that the Law Guardian representing the child's interests at the hearing concluded that the petitioner was capable of caring for Lorraine and he further concluded that the petitioner's application for custody of the child should be granted.

In reaching our determination that the petition should be granted, we are not unmindful of the damaging effect of *regular* drug use on one's ability to parent, or the terrible consequences to children exposed to cocaine in utero *(see generally, Matter of Stefanel Tyesha C., supra,* at 331). The instant case, like all others of its kind, has strong emotional appeal. We must, however, exercise a reasoned and careful review of the record in determining each case of this kind on its own peculiar facts and thereby avoid the danger posed by our dissenting colleagues' analysis. The dissenters engage in what is in essence a best interests analysis notwithstanding the absence of extraordinary circumstances, and demand that the petitioner father prove his fitness as a parent. We must diligently avoid raising the court's role as *parens patriae* of the child to supplant the natural parent's right to custody where no adequate grounds have been demonstrated. In so doing, we avoid running afoul of the principle that "[t]he State may not deprive a natural parent of her [or his] child's custody merely because a court or social agency believes it can decide more wisely than the parent or believes it has found someone to better raise the child" *(Matter of Male Infant L., supra,* at 427; *see, Matter of Bennett v Jeffreys, supra,* at 545).

If the Department believed the petitioner to be an unfit father, it was obligated to make a sufficient showing in this proceeding of extraordinary circumstances, or to commence a neglect proceeding against him *(see, Matter of Cheryl K,* 126 Misc 2d 882, 884). In order to provide meaningful protection to a child, a court should not "await broken bone or shattered psyche before extending its protective cloak around [that] child pursuant to [the child neglect provisions of] article 10 of the Family Court Act" *(Matter of Anthony,* 81 Misc 2d 342, 345; *see, Matter of Stefanel Tyesha C., supra,* at 328; *Matter of Cruz,* 121 AD2d 901, 903). Nevertheless, a proceeding to determine custody between a parent and a third person is not the appropriate method to determine the question of neglect, particularly where the evidence falls far short of demonstrating prima facie that a child is being neglected or is in danger of neglect. Accordingly, the order of the Family Court, Nassau County, continuing custody with the Department, is reversed,

and the petition is granted. Thompson, J. P., Kunzeman and Sullivan, JJ., concur.

Harwood, J. concurs in part and dissents in part and votes to reverse the order appealed from, and to remit the matter to the Family Court, Nassau County, for a further hearing and new determination, with the following memorandum: I do not share Justice Miller's conclusion that the attention of the majority is misfocused, for I agree with the majority that "extraordinary circumstances" which warrant State interference with a natural parent's rights and obligations are to be "narrowly categorized" (see, Matter of Bennett v Jeffreys, 40 NY2d 543, 545). However, I must dissent, for, unlike the majority, I conclude that narrowly categorized extraordinary circumstances here exist, thus triggering the obligation to inquire as to whether depriving the natural father of custody is in Lorraine's best interests (see, Matter of Bennett v Jeffreys, supra; see also, Matter of Male Infant L., 61 NY2d 420). It is my view that the unfortunate circumstances of Lorraine's birth, the petitioner's admitted drug use, his initial consent that custody of his newborn infant be relinquished to the Nassau County Department of Social Services, and, most significantly, his long-term lack of interest in establishing a custodial relationship with his two other children, who are Lorraine's siblings and concerning whom neglect proceedings were brought (cf., Family Ct Act § 1046 [a]), all combine to mandate that the Family Court take the rare step (cf., Matter of Bennett v Jeffreys, supra, at 549) of looking beyond petitioner's status as biological parent. Since that step, if taken, is only the initial one (see, Matter of Bennett v Jeffreys, supra, at 548), and since the Family Court here effectively but erroneously framed its inquiry as whether the petitioner adequately established he was a fit parent, I join with Justice Miller in concluding that the matter should be remitted to the Family Court, Nassau County, for evaluation of Lorraine's best interests so that a reasoned determination as to her custody can be made.

Miller, J. concurs in part and dissents in part and votes to reverse the order appealed from, and to remit the matter to the Family Court, Nassau County, for a further hearing and new determination, with the following memorandum: I vigorously dissent from the majority's decision which places this two and one-half-year-old girl in her father's custody in total disregard of the Family Court's finding that placement would pose a risk to her safety. In my opinion, the majority has overlooked essential facts, has misapplied the law, and has

abrogated the court's *parens patriae* duty to the child. The crux of our acute disagreement stems from a marked difference in focus. The majority focuses exclusively on the preservation of the rights of the biological parent against unwarranted State intervention, and hence construes the law regarding extraordinary circumstances narrowly, finding that such circumstances are absent. I recognize the natural parent's superior entitlement to custody over that of an unrelated third party in the absence of extraordinary circumstances. My primary focus, however, is the safety and fundamental rights of the child whose very life is at stake in these proceedings. I interpret the law regarding extraordinary circumstances more liberally and therefore find that they do exist in this case. Notwithstanding this conclusion, I further find the record inadequate to enable the court to reach any determination at this juncture regarding the child's best interests and custody, and, accordingly, I would remit the matter to the Family Court for a further hearing to develop the issue of the child's best interests *(see, Matter of Bannister v Bannister,* 81 AD2d 913; *Matter of Siegman v Kraitchman,* 30 AD2d 979).

The petitioner Alfredo S. is the natural father of the subject infant Lorraine, whose care and well-being are our concern on the instant appeal. Lorraine was born on July 31, 1988, at which time she tested positive for cocaine and exhibited symptoms of cocaine withdrawal as a result of drug use by her mother, Doreen S., during her pregnancy.

Because the newborn child had been exposed to cocaine, the Nassau County Department of Social Services (hereinafter the Department) was notified, and, on August 2, 1988, both the petitioner and the child's mother consented to place Lorraine with the Department pursuant to Family Court Act § 1021. Although it was obtained, the petitioner's consent to placement was not required since he had not at that time been adjudicated the child's father. Neglect proceedings were commenced against the mother, and, ultimately a finding of neglect was sustained upon her consent. No neglect proceedings were ever instituted against the petitioner.

On August 5, 1988, the petitioner filed a petition for an order of filiation and for custody. On August 29, 1988, the petitioner was adjudged to be Lorraine's father, and an order of filiation was entered on September 1, 1988.

On September 8, 1988, the petitioner brought a habeas corpus proceeding, demanding Lorraine's release from custody by the Department. Upon the consent of all parties, the habeas corpus proceeding was converted into a custody pro-

ceeding pursuant to Family Court Act article 6. Thus, the Department, in effect, assumed the role of a nonparent custodian seeking to retain custody of a child in the face of a challenge by a natural parent *(see, e.g., Matter of Spence-Chapin Adoption Serv. v Polk,* 29 NY2d 196; *Matter of Cheryl K,* 126 Misc 2d 882). After a brief hearing, the Family Court denied the petition for custody, finding that the petitioner would not be a proper custodian for Lorraine, and, most significantly, that if she were placed with her father she would be at risk. (The court disregarded the recommendation to return the child to her father made by the Law Guardian, who not only failed to provide an adequate rationale for that recommendation, but also failed to recognize that he had an affirmative obligation to require appropriate fact finding to insure his infant client's safety and well-being.) The petitioner's appeal ensued.

As stated by the majority, the appropriate initial inquiry to be undertaken is to determine whether or not extraordinary circumstances have been established on the instant record. It is by now axiomatic that a natural parent's right to custody of his or her child is superior to that of all others and "[t]he State may not deprive a parent of the custody * * * absent surrender, abandonment, persisting neglect, unfitness or other like extraordinary circumstances" *(Matter of Bennett v Jeffreys,* 40 NY2d 543, 544). While there is some uncertainty as to the line of demarcation between the two factual analyses, it is generally acknowledged that only after extraordinary circumstances have been shown to exist is the State's interference with the custodial rights of a natural parent justified, requiring the court to undertake an analysis of the disposition that will further the child's best interests *(see, Matter of Male Infant L.,* 61 NY2d 420; *Matter of Sanjivini K.,* 47 NY2d 374; *see generally, Matter of Dickson v Lascaris,* 53 NY2d 204; *but see, Matter of Bennett v Jeffreys, supra,* at 554 [Fuchsberg, J., concurring]).

In this case, I find that the Department did adduce sufficient evidence of the existence of extraordinary circumstances to justify the State's intervention into the petitioner's parental rights.

Most significant is the fact that Lorraine was born exposed to cocaine and exhibited symptoms of withdrawal. It has been estimated that since the beginning of the so-called "crack epidemic" in 1985, between 10,000 and 50,000 children have been born with cocaine in their blood streams in the City of New York, and studies suggest that half of these children are

learning-disabled (Kids at Risk, A Tormented Cry, New York Newsday, Sept. 28, 1990, at 6, col 1). Thus, the very fact that a child is born addicted to an illegal narcotic substance should, in and of itself, be deemed an exceptional circumstance warranting State interference in otherwise sacrosanct intra-familial matters such as custody. Children so effected require extraordinary care and exceptional consideration.

Indeed, it has been held that a newborn infant exhibiting symptoms of withdrawal is prima facie a neglected baby *(see, Matter of Theresa J. v Patricia J.,* 158 AD2d 364; *Matter of Vanesa "F",* 76 Misc 2d 617, 620; *Matter of "John",* 61 Misc 2d 347; see also, Matter of "Male" R.,* 102 Misc 2d 1; *cf., Matter of Smith,* 128 Misc 2d 976; *but see, Matter of Fletcher,* 141 Misc 2d 333).

Obviously it would be patently unfair to blame a father *alone* for the birth of a drug-addicted child, as the addiction occurs as an immediate result of a mother's use of drugs during pregnancy. Notwithstanding this fact of nature, however, the instant record contains substantial evidence of extraordinary circumstances attributable to the petitioner which justifies interfering with the reflexive recognition of his custodial rights.

First and foremost, the petitioner is himself an admitted drug user. Indeed, he admitted to two different caseworkers that he was at least an occasional user of cocaine *(cf., Matter of Scott L. v Bruce N.,* 126 AD2d 157). Clearly, although the petitioner is now allegedly "clean" and trying to bring his drug abuse under control, the fact remains that he admitted using cocaine during Doreen's pregnancy *while they were cohabitating.* The petitioner's judgment as to his ability to raise a child is thus squarely called into doubt *(see, Matter of Scott L. v Bruce N., supra; Matter of Jones v Payne,* 113 AD2d 968; *Wohlfahrt v Drees,* 103 AD2d 1028).

Moreover, we must remain cognizant of the on-going nature of the petitioner's relationship with Lorraine's mother. As previously noted, Lorraine is the third out-of-wedlock child born to the petitioner and Doreen, all three of whom have been found to be neglected. I find this to be a highly relevant fact which the majority has completely ignored. Lorraine's elder siblings, who were approximately six and seven years old, respectively, at the time this proceeding was commenced, are in the foster care of Doreen's mother while Doreen undergoes drug rehabilitation. I find it significant that the petitioner has never provided support for the older children and that the instant proceeding marks the first occasion upon

which he has been willing to accept any responsibility for the care and upbringing of any of his offspring. Also relevant is the petitioner's admittedly sporadic employment history, which has apparently been checkered by recurring "problems with fellow employees," resulting in recurring periods of unemployment.

Furthermore, notwithstanding the petitioner's express desire to provide for Lorraine's care, the record is devoid of any indication as to whether the child's in utero exposure to cocaine has rendered her or will render her learning-disabled, whether any other special requirements will have to be met to provide for her care and upbringing, and whether the petitioner is capable of satisfying these needs.

Accordingly, in my opinion, the petitioner's continuing relationship with the child's drug-addicted mother over a period of years, that has produced three out-of-wedlock children, all of whom have been adjudicated neglected, none of whom he has supported financially, his admitted past drug use, and the subject child's addicted condition at birth, the petitioner's lack of an established household and his unwed state, while perhaps insufficient to establish his present unfitness for custody, are sufficient to constitute such extraordinary circumstances as to preclude our automatic placement of the child in his custody.

The concept of "extraordinary circumstances" enunciated by the Court of Appeals in *Matter of Bennett v Jeffreys (supra),* and repeated frequently in subsequent authorities, does not limit the State's intervention in a natural parent-child relationship solely to circumstances where the parent is proven unfit. A variety of other factors have been found sufficient to constitute such extraordinary circumstances, in addition to and exclusive of the proven unfitness of the natural parent.

The court in *Matter of Bennett v Jeffreys (supra,* at 549) prescribed a two-prong test to govern the State's intervention: "intervention by the State in the right and responsibility of a natural parent to custody of her or his child is warranted if there is first a judicial finding of surrender, abandonment, unfitness, persistent neglect, unfortunate or involuntary extended disruption of custody, or other equivalent but rare extraordinary circumstance which would drastically affect the welfare of the child. It is only on such a premise that the courts may then proceed to inquire into the best interest of the child and to order a custodial disposition on that ground".

In *Bennett,* the 15-year-old unwed natural mother resided

with her parents when she gave birth to her child and was pressured by her mother to relinquish custody of the child to a former classmate of her grandmother. The extent of the mother's contact with the child in the intervening years was disputed. When the mother sought to regain custody eight years later at age 23, she was about to graduate from college and was still living with her family, who then favored her regaining custody. However, the custodian of the child, who had since been separated from her husband and was employed as a domestic, sought to retain custody of the child. Neither the Family Court nor the Appellate Division found statutory abandonment or surrender, or that the mother was in any way unfit. However, the Family Court's dismissal of the natural mother's petition was reversed by the Appellate Division, which granted the mother's petition and directed the return of the child to her.

The Court of Appeals reversed the Appellate Division, upon its finding of the following extraordinary circumstances: (1) the protracted separation of eight years of mother and child, (2) the mother's lack of an "established household", (3) the mother's "unwed state", and (4) the child's attachment to her custodian (*Matter of Bennett v Jeffreys, supra,* at 550). While the *Bennett* court found the record sufficient to establish extraordinary circumstances, it found the record insufficient to justify either the Family Court's decision that the child's best interests would be served by giving custody to the long-time custodian, or the Appellate Division's decision that it would be served by giving custody to her natural parents. The Court of Appeals therefore remitted the case to the Family Court for a new hearing to examine the psychological state and background of the mother and the qualifications and background of the long-time custodian, in order that the court might then determine the issue of custody in the child's best interest. I would follow the same course in this case, where the record is barren of essential information.

The development of the law following *Bennett* illustrates that extraordinary circumstances have been found to exist where placing the child in the custody of a natural parent would cause a risk to the child's safety or result in psychological trauma. Thus, such circumstances were found to exist based upon a natural mother's voluntary surrender of her child to a friend, the child's bond to his psychological family, and the mother's mental problems (*see, Matter of Kreslein v Hanley,* 157 AD2d 659), a prolonged separation between the natural father and his out-of-wedlock child, the lack of an

established household, his unwed state, and the attachment of the child to the custodian *(see, Matter of Michael Paul T. v Thomas R.,* 124 AD2d 970), the father's history of drug addiction *(see, Matter of Scott L. v Bruce N.,* 126 AD2d 157, *supra; Wohlfahrt v Drees,* 103 AD2d 1028, *supra),* the father's history of alcohol abuse *(see, Matter of Abendschein v Gatti,* 105 AD2d 1101), and the traumatic effect upon the child of separation from siblings *(see, Matter of Curry v Ashby,* 129 AD2d 310; *Matter of Mark V. v Gale P.,* 143 Misc 2d 487).

On the other hand, seemingly similar circumstances were found not "extraordinary" in a dispute between the natural mother and the Schenectady Department of Social Services, notwithstanding a lengthy separation between mother and child and the psychological bonding between the child and her foster parents *(see, Matter of William I. v Schenectady County Dept. of Social Servs.,* 102 AD2d 482), nor where there was a protracted voluntary separation between the natural father and the child and a close attachment between the child and his aunt *(see, Matter of Merritt v Way,* 85 AD2d 666, *affd* 58 NY2d 850; *see also, Matter of Nadia Kay R.,* 125 AD2d 674), nor in spite of a 14-month separation between the natural father and child where the mother had died *(see, Matter of Pernice v Cote,* 116 AD2d 945). Likewise, extraordinary circumstances were not found where the mother relinquished guardianship of her out-of-wedlock child *(see, Matter of Milligan v English,* 132 AD2d 967), or where the mother attempted to give up her out-of-wedlock child for adoption, but her consent was invalid *(see, Anonymous v Anonymous,* 108 Misc 2d 1098).

However, the facts in the case at bar are not only uniquely distinguishable from those referred to above, but they are far more extraordinary, since Lorraine, at risk from birth due to drug addiction, will be subjected to further risk and psychological trauma by her abrupt removal from an environment to which she has become accustomed and her resulting placement in the inexperienced hands of her father whose past history gives me grave cause for concern and about whose present condition I know almost nothing.

Notwithstanding the existence of extraordinary circumstances, the father should not be deprived of custody absent a hearing and determination of his physical and emotional fitness and the child's needs and best interests. The petitioner claims he has terminated his admitted drug habit, that he is now gainfully employed as a hospital food service worker, and that he has made suitable arrangements for Lorraine's care

with the help of his family. In the course of a best interests hearing, he would be expected to proffer evidence in support of these allegations. Not a scintilla of such proof has yet been put before any court. His entire case rests solely upon admission into evidence of the order of filiation. He chose not to testify in his own behalf at the hearing in support of his petition for custody of his infant daughter.

The majority's decision to grant custody to the father is based upon its finding that the Department failed in its obligation to make a showing in the first instance to establish extraordinary circumstances or thereafter to commence a neglect proceeding. In so doing, the majority succeeds in protecting the father's rights at the potential expense of the safety and well-being of the child. In effect, the majority has abandoned the child to the whim and chance of the system, satisfied to depend entirely upon the competence, incompetence, the diligence or irresponsibilities of its various elements, ignoring the fact that a child, rather than a property interest, is at stake. Ironically, the majority refers us to the warning pronouncement of another court which urged that we must not "await broken bone or shattered psyche before extending [our] protective cloak around [a] child pursuant to * * * article 10 of the Family Court Act" *(Matter of Anthony,* 81 Misc 2d 342, 345; *see, Matter of Stefanel Tyesha C.,* 157 AD2d 322, 328; *Matter of Cruz,* 121 AD2d 901, 903). In this proceeding, such a protective cloak is, however, denied Lorraine as her custody is transferred, in a knee-jerk reaction, to her father under circumstances that cry out for a responsible inquiry.

The majority opinion not only ignores the courts' *parens patriae* duty to the child but also a recognized "shifting of emphasis" in the state of the law, reflecting "the modern principle that a child is a person, and not a subperson over whom the parent has an absolute possessory interest. A child has rights too, some of which are of a constitutional magnitude" *(Matter of Bennett v Jeffreys, supra,* at 546; *see, Goss v Lopez,* 419 US 565, 574; *Matter of Winship,* 397 US 358, 386; *Tinker v Des Moines School Dist.,* 393 US 503, 505; *Matter of Gault,* 387 US 1, 47).