Lori M. v Joan S. (2004 NY Slip Op 51778(U))

[*1]

Lori M. v Joan S.

2004 NY Slip Op 51778(U)

Decided on November 21, 2004

Family Court, Suffolk County

Lynaugh, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 21, 2004

Family Court, Suffolk County
LORI M., Petitioner,
against
JOAN S., Respondent.
V-04219-98/04C

FOR PETITIONER
Stephen Hellman, Esq.
1235 Montauk Highway
Mastic, NY 11950
FOR RESPONDENT
Kevin J. Werner, Esq.
120 Fourth Avenue
P.O. Box 5591
Bay Shore, NY 11706
LAW GUARDIAN
Debra A. Byrnes, Esq.
310 Hallock Avenue
Port Jefferson Sta., NY 11776

Barbara Lynaugh, J.
By petition dated 5/3/04, petitioner-mother seeks to modify an order of this court, entered 3/17/04, which, upon the parties' stipulation, continued a prior order of this court (Dounias, J.), dated 2/24/99, which, also upon the parties' stipulation, granted custody of petitioner's child Victoria C. G., born 6/19/98, jointly to respondent Joan S. and her now deceased husband, maternal great-uncle Steven S. Mother now seeks to have Victoria returned to her custody.
Having heard the evidence offered at the hearing, and with thorough and careful consideration, the court makes the following findings and conclusions.
 PROCEDURAL HISTORY
[*2]
The 1999 order was issued at a time when mother was hospitalized in a long-term residential substance abuse treatment program. The terms of the parties' stipulation, which was "so ordered" by the court, makes it clear that the award of custody to respondent was meant to be on an interim basis only.
Respondent and her husband were granted custody of Victoria "until such time as [mother] has successfully demonstrated that she can provide a suitable independent living environment in a house or apartment for [mother] and child, that she is drug and alcohol free, that she has obtained employment and has arranged suitable child care for the child when she is at work."

There is no dispute that it has always been within the contemplation of the parties (and, more importantly, within the expectations of Victoria) that Victoria would be returned to her mother as soon as mother had finished her treatment program and could demonstrate that she was able to care for the child. The ordered stipulation contains additional language indicating that it was not intended to be a final resolution. The "pending matter" was "marked off of the court calendar" and mother was given the "ability and right to restore the matter to the calendar at any time by writing a letter to the court."
However, a review of the court file and the testimony indicates that the above language outlining the conditions under which Victoria was to be returned to her mother has given rise to no less than four years of litigation.
Mother first sought to regain custody by petition filed in November 2000 which was subsequently withdrawn when respondent allowed mother to have regular weekend visitation with Victoria. Mother contacted respondent in June
of 2001 to tell her she had fulfilled the requirements of the 1999 agreement and requested that custody of Victoria be returned to her. Maternal great-uncle Steven S. (the joint custodian with whom mother had the closer relationship) was now deceased, and respondent felt mother "wasn't ready" to assume custody. Mother brought a second petition seeking custody of Victoria in August 2002; respondent again opposed returning Victoria.
Upon the intervention of the Law Guardian, the parties eventually began working on a gradual return of custody to mother by increasing the amount of mother's visitation and by arranging meetings between mother and Victoria's therapist. Respondent then demanded that mother meet additional requirements and ultimately opposed further reunification efforts. When further attempts to reach a resolution proved fruitless, the matter was scheduled for trial.
[*3]
The trial commenced in January 2004. After two days of testimony, the parties reached an interim agreement, embodied in the 3/17/04 order, pursuant to which they would utilize the assistance an independent psychologist for the gradual transition of custody to mother. Respondent admittedly failed to provide the Law Guardian with names of psychologists who participated in her health insurance in contravention of the order. Respondent continued to oppose the return of custody, and mother brought the instant petition in May 2004.
The Law Guardian then attempted to schedule a forensic evaluation with the hopes of obtaining a recommendation regarding the best way to facilitate the transition of custody. The forensic evaluator was not available to provide these services in a reasonable time frame and the trial reconvened in September 2004.
For the purposes of rendering this decision, the court has considered all of the testimony presented in both January and September of 2004.
 FACTUAL FINDINGS 
Victoria was born on 6/19/98. Following her birth, Victoria resided in Huntington with mother and mother's former boyfriend. On 8/8/98, mother was "fighting profusely" with her boyfriend who became physically abusive towards mother. Concerned for the safety of her daughter, mother contacted her uncle Steven S. and his wife (the respondent) and asked them to care for Victoria. Mother also left the residence. Shortly thereafter, mother asked Mr. and Mrs. S. to keep Victoria because mother began using cocaine at this time.
On 8/24/98 (i.e., less than three weeks later) mother entered the APPLE program (now known as Phoenix House), a 22-month residential substance abuse treatment facility. Mother successfully completed the in-patient phase of the program as scheduled in July 2000. While hospitalized, mother successfully completed a required parenting skills workshop in March 1999.
Mother's 22-month in-patient program was followed by a seven-month mandatory out-patient program, which mother successfully completed as scheduled on 2/26/01. Mother then successfully completed the final portion of the program, an additional two months at the out-patient facility during which she was required to co-facilitate a treatment group. Mother has been completely drug free since she first entered the program in August 1998.
From the time Victoria first went to reside with respondent, mother has exercised virtually all of the visitation she has been permitted to exercise. There were no visits [*4]allowed by the APPLE program for the first six weeks following mother's admission. There was a brief period of time during the program when mother lost her visitation privileges because she "acted out."
Mother and respondent have never had a good relationship; their relationship is now so profoundly strained that they barely speak. The parties' impaired relationship has had a substantial impact on mother's access to Victoria. Until October 2000, mother's visitation with Victoria was severely limited by respondent. While she was hospitalized, mother could only see Victoria when respondent brought the child to the facility. Once mother completed her
in-patient treatment in July 2000, mother was only permitted to visit Victoria
for brief periods of time at respondent's home while respondent was present.
During this time, respondent insisted that Victoria call her mother "Lori" and that the child call respondent "Mommy." Respondent registered Victoria for pre-school and various activities as "Victoria S." and had labels sewn into Victoria's clothes with this name.
Mother became so distressed over these developments that she explored the possibility of having Victoria adopted by her mother's long term friends, because they had promised mother that she would have unrestricted access to Victoria, including visitation each weekend, and that mother would remain involved in every aspect of Victoria's life. Mother became visibly distraught and overcome with emotion while she recounted these events and needed a recess before she was able to continue her testimony.
Mother executed an adoption surrender in July 2000. This led to respondent virtually holding Victoria hostage until mother signed a revocation shortly thereafter. Once mother signed the revocation mother was allowed, for the first time, to have visitation with Victoria away from respondent's home. Since October 2000, mother has had visitation with Victoria on weekends and holidays.
Mother was employed at Phoenix House in Hauppauge from March 2000 through June 2003. Mother was terminated from this employment after taking a requested day off not knowing her employer had lost her written request. Mother had planned to leave this employment in any event because she felt that it had become an unsuitable environment due to the admission of sex offenders into the program and the presence of drugs in the facility.
Mother began employment at a bakery in August 2003; she has maintained this employment to date. Mother works from 6 AM to 3:30 PM on Tuesdays through Fridays; [*5]her net pay is $350 per week. Mother began a maternity leave the end of August 2004; she was scheduled to give birth by Caesarean section the day after the conclusion of testimony on 9/9/04.
Mother resides in a clean and properly furnished two-bedroom apartment in East Northport with Peter A., with whom she has resided for the past
3 ½ years. Mr. A. has been steadily employed as a painter for the past
30 years; he earns $700 to $800 per week; his income for 2003 was $32,000.
Mr. A. is the father of the new baby. He considers mother, the new baby, and Victoria to be his "family." Mr. A. impressed the court as genuine and sincere; his concern for mother and the children was quite obvious.
Mr. A. has been present in the home during mother's weekend visitations with Victoria and has developed a close emotional bond with the child, who calls him "Daddy." Mr. A. strongly supports mother's attempt to obtain custody of Victoria and is more than willing to continue to support and provide a home for mother, the baby, and Victoria.
Mr. A. has also completed two years in the APPLE program. His admission into the program was court mandated in 1998 as a condition of probation following a conviction for driving while intoxicated. Mr. A. has essentially been sober since 1998, other than a one-day relapse following his brother's death three years ago. To his credit, this brief relapse caused Mr. A. sufficient concern to admit himself to a 28-day in-patient program.
Neither mother nor Mr. A. have had any recurrence of alcohol or drug use since they completed treatment and neither poses any threat to Victoria in any way. Both mother and Mr. A. recognized their need for substance abuse treatment very shortly after their problems became evident. Mother voluntarily entered her treatment program just three weeks after she started using drugs, and she successfully completed the program in its entirety as scheduled. Mr. A. sought treatment immediately after a one-day relapse.

Mother has maintained frequent visitation and has built a close emotional bond with Victoria despite the many obstacles respondent has placed in her way. She has maintained steady employment, established a proper home environment with a sufficient household income, and has a stable relationship with a nurturing partner who is genuinely concerned and supportive. Mother has demonstrated repeatedly that she is, in all regards, a loving, fit, devoted, and capable parent.
Respondent is a professor of child studies at St. Joseph's College, where she earns [*6]$54,000 per year. Respondent has employed Thelma F. as a live-in child care provider for Victoria for the past three years. Respondent lives in a very large single family home with her two adult children and Victoria. Respondent has "more than a couple of million" in bank accounts available to care for Victoria. Respondent married Jack S. in June 2001 following her husband's death. The couple separated in November 2001, and divorce proceedings are pending.
Respondent concedes that mother first informed her in June 2001 that she had met the requirements of the 1999 stipulation and that she wanted Victoria returned to her care. Respondent told mother that she did not think mother
"was ready" to assume custody. Mother's visitation was eventually expanded.
Mother maintained the expanded visitation and again sought Victoria's return in the Fall of 2002. Respondent again resisted and then eventually demanded that mother meet with Dr. Chernuchen, Victoria's therapist, to work on a "transition plan." Mother had met with Dr. Chernuchen on two earlier occasions prior to April of 2002.
The meeting with Dr. Chernuchen during which respondent's proposed "transition plan" was to be discussed occurred on 8/17/03 and was attended by respondent, mother, and Mr. A.. Dr. Chernuchen wanted mother and
Mr. A. to sign a one-year transition plan, the end result of which would have placed Victoria in mother's care from Monday to Friday and in respondent's care each weekend.
It was also during this meeting that mother learned that Dr. Chernuchen felt that it was proper for Victoria to refer to respondent as "Mommy." Mother wisely declined to accept respondent's proposed transition plan. Rather than seek any more "help" from Dr. Chernuchen, whom mother rightfully concluded
was biased in favor of respondent, mother sought court intervention.
 LEGAL ANALYSIS
In this proceeding, the natural mother seeks an award of custody as against the respondent, a non-parent. This is a proceeding to modify a consensual order of custody where there has been no prior adjudication. Since there has been no prior judicial determination of custody, and this is a matter in which a non-parent seeks to retain custody as against a natural parent, the court will treat this as a 
de novo proceeding. This is necessary for the purposes of determining whether the required threshold showing of extraordinary circumstances has been demonstrated and whether an inquiry into the best interests of the child is proper herein.
[*7]
It has long been established that when a non-parent seeks custody of a child as against the child's natural parent, the parties do not have equal standing as they do not have an equal right to custody of the child. Under normal circumstances, the parent would have the superior right to custody, since she is the natural parent and has a constitutionally protected right to raise her own child. Similarly, the child has a right to be raised by her own parent. Before the court can interrupt a parent-child relationship by awarding custody to a
non-parent, a threshold inquiry must first be made.
"Intervention by the State in the right and responsibility of a natural parent to custody of her or his child is warranted if there is first a judicial finding of surrender, abandonment, unfitness, persistent neglect, unfortunate or involuntary extended disruption of custody, or other equivalent but rare extraordinary circumstance which would drastically affect the welfare of the child. It is only on such a premise that the courts may then proceed to inquire into the best interest of the child and to order a custodial disposition on that ground." Bennett v. Jeffreys, 40 NY2d 543, 387 NYS2d 821 (1976).
The Court of Appeals restated and further defined this standard in Matter of Male Infant L., 61 NY2d 420, 474 NYS2d 447 (1984), a case very similar to the case at bar. In Male Infant L., a natural mother placed her child in a private
pre-adoptive home following his birth. Shortly thereafter, she notified the foster parents that she wanted her child returned.
Since the case involved "the very fundamental rights and responsibilities at the heart of the parent-child relationship," the Court cautioned that "resolution of a dispute...involving such paramount and basic concerns, demands faithful attention and adherence to the strong public policies and overriding principles which have governed our past decisions."Id., at 423.
Not unlike the case at bar, Male Infant L. also involved a prolonged period of separation between mother and child. Once mother had notified the foster parents that she wanted her child returned, the foster parents became determined to keep the child. They avoided a habeas corpus proceeding in California, it took some time for mother to secure the funds needed to commence proceedings in New York, and trial continued intermittently over nine months.
Mother, who had no contact with the child for the first year of the child's life, was a poor, unwed, undocumented worker who spoke little English and who had no settled [*8]plans for the child's and her own future. The foster parents, who had raised the child from birth until he was almost four years old, were obviously financially secure and had resources far superior to those of the mother with which to care for the child.
These facts notwithstanding, the Appellate Division affirmed the Family Court's conclusion that the law required the child be returned to her mother. Finding mother to be "both fit and devoted," the Court ruled that "absent extraordinary circumstances, not present here, the court may not intervene between the natural parent and child to determine if the latter's best interest would be better served under someone else's care." (emphasis added) Id, at 426.
The Court of Appeals affirmed, finding "the State may not deprive a natural parent of her child's custody merely because a court or social agency believes it can decide more wisely than the parent or believes it has found someone to better raise the child.... For once it is found that the parent is fit, and has neither abandoned, surrendered, nor otherwise forfeited parental rights, the inquiry ends and the natural parent may not be deprived the custody of his or her child." (emphasis added) Id., at 427. 
The Court specifically addressed the issue that a "'disruption of custody over an extended period of time' could amount to an extraordinary circumstance sufficient to justify inquiry into whether custody with a nonparent would serve the child's interests" (Id., at 428) within the meaning of Bennett v. Jeffreys, supra, at 548.
In this regard, the Court held "when, in a case such as this, the separation between the natural parent and child is not in any way attributable to a lack of interest or concern for the parental role, that separation does not amount to an extraordinary circumstance and, indeed, deserves little significance." (citations omitted) Matter of Male Infant L., supra, at 429.
This reasoning was followed in another closely analogous case, Matter of Alfredo S. v. Nassau County Department of Social Services, 172 AD2d 528,
568 NYS2d 123 (2d Dept., 1991.) Father, who had a history of drug abuse, had initially given custody of his daughter to the Department of Social Services at birth, and the child remained in the custody of the Department for two years. Although he visited with the child infrequently due to a lack of transportation, father had "continually exhibited an interest in and concern for the child, particularly demonstrated by his persistence in seeking to obtain custody." 
Id., at 532.
The Court found that the extended period of separation "was not due to an [*9]abandonment of the child by [father] nor even to a lack of interest or concern in the child's welfare," but to the actions of the Department and the pace of the proceedings. Id., at 530. Citing Matter of Male Infant L., supra, the Court held "under circumstances such as these, although the initial relinquishment of custody was with the natural parent's consent, the separation between the natural parent and the child does not rise to the level of an extraordinary circumstance triggering a best interests inquiry." Id. The Court further ruled that "the burden of demonstrating the existence of 'extraordinary circumstances' so as to trigger the need for a best interests hearing is upon the party seeking to deprive the natural parent of custody." (citations omitted) Id., at 529-530.
In another Appellate Division case, a prolonged period of separation was found not to be an extraordinary circumstance where the separation occurred during the mother's repeated attempts to regain custody. In Matter of William I. v. Schenectady County Department of Social Services, 102 AD2d 482,
478 NYS2d 120 (3d Dept., 1984), mother, who had a history of mental illness, placed two children with the Department of Social Services. Mother thereafter cooperated with the Department's plan, taking all the steps necessary to treat her mental illness. She utilized support services, took her medications, and moved from halfway house to her aunt's house, securing the return of one child.
A earlier termination of parental rights petition had been dismissed when the Department failed to prove its case. Throughout the various court proceedings, mother had made it clear that she wanted both children returned. The Family Court found "extraordinary circumstances" as to the second child because he had been separated from mother at birth, had "psychologically bonded" to the foster parents, and "much of the subsequent separation was a result of proper legal processes." Id., at 485.
The Appellate Division reversed, holding that the Family Court "lacked a basis for finding that extraordinary circumstances existed so as to permit it to look to the best interest of the child," noting that "the record included no evidence of surrender, abandonment or persisting neglect, and the agency had previously failed to prove its case alleging [mother's] unfitness." Id.
Citing Matter of Male Infant L., supra, at 429, the Court specifically found that the lengthy separation of mother and child and the resultant closer bond between the child and the foster parents were insufficient to establish extraordinary circumstances within the meaning of Bennett v. Jeffreys, supra. 
Another case in which a finding of extraordinary circumstances was rejected in the absence of parental unfitness was Culver v. Culver, 190 AD2d 960, 594 NYS2d 68 (3d [*10]Dept., 1993.) This was a custody proceeding between a mother and her children's paternal grandparents. Although mother had moved several times and was not consistently affectionate or attentive to the children, she was expressly not found to be unfit. 
In the absence of such a finding, the Court held that these other parental deficiencies, "considered alone or cumulatively, are insufficient to establish the type of gross misconduct or other behavior evincing utter indifference and irresponsibility necessary to supplant the natural parent." Id., at 961-962, citing Matter of Male Infant L., supra.
The court further ruled that "the claimed psychological bond between the children and their grandparents has no bearing on [mother's] rights as a natural parent in the absence of unfitness, abandonment, persistent neglect or other gross misconduct or grievous cause." (citations omitted) Id., at 962.
In the case at bar, we have a mother who recognized early on the need to remove herself and her infant child from a physically abusive household. She also readily acknowledged her need for long-term substance abuse treatment. Mother sought and successfully completed that treatment because it was what she needed to enable her to be a proper parent for daughter.
Mother thereafter took every conceivable step necessary to achieve this goal. She completed all phases of the treatment program without interruption; she remained drug free; she completed a parenting course. Throughout her hospitalization, mother maintained visitation with Victoria and developed a close, nurturing relationship with the child.
Once the in-patient portion of her treatment program was completed, mother continued to exercise all available visitation with Victoria and repeatedly sought increased visitation. She maintained steady employment, established a proper home for herself and her child, and has developed a stable relationship with a loving and supportive partner. Mother has consistently demonstrated that she is, in all respects, a fit, loving, concerned and capable parent.
For the past six years, mother has done everything possible to secure the return of her daughter. Once mother completed her treatment program in April 2001, it was only the obstinance of the respondent which prolonged the separation between Victoria and her mother. This child should have been returned to her mother more than three years [*11]ago. There is no reason to delay this any further.
Since mother has consistently demonstrated that she is a fit and capable parent and since the lengthy separation between mother and Victoria was occasioned solely by the actions of the respondent while mother was seeking the return of the child, the court finds that there are no extraordinary circumstances which would justify an inquiry into the best interests of Victoria, who clearly belongs with her mother. Matter of Male Infant L., supra.
Accordingly, respondent is directed to return Victoria to her mother forthwith along with all of the child's medical and academic records. Respondent shall have visitation with the child on alternate Sundays. Respondent shall not bring the child for any further sessions with Dr. Chernuchen.
A separate order will enter.
Dated: November 21, 2004
 
 BARBARA LYNAUGH
 JUDGE OF THE FAMILY COURT